[L. A. No. 12440. In Bank.—December 29, 1930.]

JACK PRETZER, Respondent, v. CALIFORNIA TRANSIT COMPANY (a Corporation), Appellant.

Young & Young, De Forrest Home, Wakefield & Hansen and Lasher B. Gallagher for Appellant.

Theodore M. Stuart for Respondent.

THE COURT.—After a careful reconsideration of this cause, we are pleased to adopt the following opinion of Mr. Acting Presiding Justice Marks of the Fourth Appellate District, as the opinion of this court in bank herein:

"On August 11, 1928, respondent was riding with his son, Ed Pretzer, his wife, and a Mrs. Margaret McCarthy, in a Ford sedan, traveling east on White's Bridge road, a county road running in a general easterly and westerly direction in the county of Fresno, state of California. At

a place on the road about one and a half miles westerly from the city limits of the city of Fresno, the Ford sedan, which was being driven by Ed Pretzer, came into collision with a motor-driven passenger stage belonging to appellant, and being operated by its servant. Respondent was injured in the accident and was awarded damages in the sum of $12,000 after a trial before a jury.

"According to the evidence the passenger stage was traveling west on the White's Bridge road. Preceding it was a bakery truck traveling in the same direction. When the Ford sedan, occupied by respondent and his party, had approached the bakery truck so that only between thirty-five and sixty feet intervened between these two vehicles, the stage of appellant swung to the left from behind the bakery truck and directly in the path of the Ford sedan. When Ed Pretzer saw the stage in front of him on the south half of the highway he immediately applied his brakes and swung his car slightly to the left and then to the right, hoping to avoid a collision. The stage driver did the same thing and finally drove toward his left side of the road so that at the time of the collision the stage was headed in a southwesterly direction with its front wheels off the south edge of the pavement and with part of the body of the stage and its rear wheels on the south half of the pavement. The Ford hit the stage back of its center on its right-hand side, tearing the right fenders and right running board from the sedan. Respondent was sitting in the right front seat of the Ford with the window in the door open and his right elbow protruding outside the car. The force of the collision broke respondent's right arm between the elbow and the shoulder and lacerated the skin and flesh on the arm and hand. He also received a superficial scalp wound and was rendered unconscious for a few hours. Neither of the vehicles involved in the accident was traveling at an excessive rate of speed. With the exception of the driver of the stage all of the witnesses testifying, including passengers in the stage, described the collision as we have here set it forth.

"The stage driver testified that when he attempted to pass the bakery truck the Ford sedan was at least fifteen hundred feet down the road and in front of the truck; that

the bakery truck increased its speed, and that the stage and the truck proceeded side by side for about two hundred feet when he saw that a collision was imminent and attempted to drive the stage off the pavement and to the south side of the road. As we have observed, the testimony of this witness stands entirely alone. It is not consistent. His estimate of the speed of the Ford sedan was that it was traveling only slightly faster than the bakery truck and the stage. If, as this witness testified, the bakery truck and the stage traveling side by side only covered two hundred feet, it would have been impossible for the Ford, traveling at the rate of speed fixed by the stage driver, to have covered the remaining thirteen hundred feet and reached the scene of the accident, in the length of time that the other two vehicles were traversing the two hundred feet side by side.

"While appellant sets forth many assignments of error upon which it relies for a reversal of the judgment, these assignments fall into two general classes: First, those concerning contributory negligence on the part of respondent and his son, the driver of the sedan, and second, those concerning the size of the verdict by which respondent was awarded damages in the sum of $12,000.

"The errors complained of concerning the alleged contributory negligence of respondent and his son relate principally to instructions given by the court, and other instructions proposed by appellant and refused by the court. Some of the instructions given and complained of are inartistic and might have been improved upon. However, the jury was correctly instructed upon the question of negligence, contributory negligence and proximate cause. The evidence in this case so conclusively shows negligence on the part of the driver of appellant's stage, and that this negligence was the sole and proximate cause of the injury unaffected by any act or omission of either respondent or his son that the jury could do nothing else than conclude that appellant was solely responsible for the injury to respondent.

"The record fails to disclose any suggestion of contributory negligence on the part of either respondent or his son, therefore we conclude that if there were any errors in the instructions given or refused by the court on the question of negligence, contributory negligence and proximate

cause of the injury they were harmless and not prejudicial and are not grounds for a reversal of the judgment, as any verdict that did not fix responsibility for the accident upon appellant because of the negligence of its servant would have been contrary to the evidence.

"Upon the question of errors of the court affixing the amount of damages awarded to respondent, we are confronted with a more difficult problem. The amount of $12,000 is large considering the injuries of respondent.

"Respondent was taken to a hospital in the city of Fresno, where his broken arm was set and his other injuries dressed. On the day following the accident his physician discovered that the broken bones in the arm had slipped, requiring that it be reset. Respondent was then taken to the office of his physician in the city of Madera and the fracture was again reduced by the aid of the fluoroscope. The arm was placed in a position at right angles to the body with the forearm extended to the front and held in position upon an ordinary hardware bracket. The entire arm and body from below the waist to the neck were encased in a plaster cast, which was not removed for about five weeks. This means of reducing a fracture was painful and undoubtedly caused respondent considerable suffering. However, respondent was not confined to his bed after the second reduction of the fracture. He walked home from the doctor's office and was taken to the home of his sister in an automobile. He visited the doctor's office on frequent occasions during the ensuing two weeks, walking up and down a flight of stairs to and from the office. About two weeks after the accident he returned to his home at Knights Landing, near Sacramento, California, returning two or three times during the next three weeks to consult his physician, after which time the cast was removed and he was discharged from the care of his physician.

"At the trial, which took place about eight months after the accident, respondent's physician testified that there was a slight impairment in the rotation of respondent's right arm, but that this would disappear within about a year from the time of the injury. No claim of any permanent injuries to respondent was made.

"At the time of the accident respondent was engaged in farming thirty-five hundred acres of cotton near Knights Landing in Sacramento County, California. He was employed by the California Cotton Credits Corporation to superintend one thousand acres of growing cotton at a salary of $400 per month. Respondent was raising twenty-five hundred acres of cotton on his own account. His duties consisted solely of superintending the work of growing these crops and in directing the efforts of laborers employed to do the actual work upon them. There is evidence that the reasonable value of such services was the sum of $1,000 per month. Respondent was totally disabled for five weeks and according to the testimony was partially disabled for several weeks longer. After a lapse of the first several weeks he might have resumed the duties of superintending the growing of his cotton crop. He was not re-employed by the California Cotton Credits Corporation, which stopped his wages on the day of the accident.

"Over appellant's objection, respondent was permitted to testify that in the event of his not being injured he would have had his cotton crop irrigated during this time of his total disability, but that on account of the injuries this irrigation did not take place and the crop suffered from a lack of water. Over like objection he was permitted to testify that if a normal crop were produced on thirty-five hundred acres of land under the conditions existing in 1928, such crop would have amounted to about three-fourths of a bale per acre and would have had a total value of about $200,000. Upon what theory this evidence was admitted does not appear from the record. One thousand acres of the cotton belonged to the California Cotton Credits Corporation and not to him. The value of the crop on this land made no difference to him financially. He was receiving a salary of $400 per month for superintending its growing. If the crop had been a total failure the loss would have fallen on the corporation and not on respondent.

"The value of the crops grown under the supervision of respondent was no proper measure of the damages suffered by him as a result of his injuries as he superintended the growing of the crops and employed laborers to do the actual work of caring for them. As the Supreme Court

said in the case of *Lombardi* v. *California Street Ry. Co.*, 124 Cal. 311 [57 Pac. 66, 69]: 'The loss of profits in conducting a business involving the labor of others is not a necessary consequence of personal injury to plaintiff. The extent of his recovery upon this ground would be what his services were worth in the conduct of such a business as he was engaged in.' To the same effect are the cases of *Walsh* v. *New York C. & H. R. Co.*, 204 N. Y. 58 [37 L. R. A. (N. S.) 1137, 97 N. E. 408], and *Lo schiavo* v. *Northern Ohio T. & L. Co.*, 106 Ohio St. 61 [27 A. L. R. 424, 138 N. E. 372].

■ ''Respondent introduced evidence that the reasonable value of his services was the sum of $1,000 per month. The evidence as to the value of the cotton crop was dangerous because it might tend to lead the jury to believe that the actual damage to respondent was not only the loss of the reasonable value of his services, but also a very material injury to the valuable crops. Whether or not the crop actually produced was a normal one does not appear. Appellant proposed an instruction intended to attempt to cure this error, which instruction was refused by the court. It should have been given.

■ ''Respondent testified that he did not return to work and to the performance of his duties for almost eight months after his injury. There is a strong inference from the evidence that he was able to perform part of his duties as soon as the cast was removed. His attending physician testified that he was able to attend to his duties three months after the injury. Appellant proposed the following instruction, which was refused by the court:

'' 'The plaintiff is under a duty to minimize his damages in every way that he can reasonably do so, and when he was reasonably able to return to his work, whether he did so return at that time or not is immaterial, and his damage for loss of time in attending his crop would terminate at that time.'

''This instruction should have been given. The rule is well stated in 8 California Jurisprudence, 782, as follows: 'It is the duty of one who knows he is threatened with detriment, either in person, property or business, through another's breach of contract or tort, to do all that he reason-

ably can to prevent or minimize the damage, and if he negligently fails to do this, he cannot recover for what he might have prevented.'

"It was held in *Baker* v. *Borello,* 136 Cal. 160 [68 Pac. 591, 593], as follows: 'The party injured by the tort of another must not by his negligence or wilfulness allow the damage to be unnecessarily enhanced; and if he does so he cannot recover for the increased loss.'

■ "Respondent was totally disabled for five weeks after his injury. He was partially disabled for several weeks thereafter. He suffered more pain than would follow from a fractured arm that could be reduced in the ordinary way and is entitled to compensation for pain and suffering. The damages awarded were large for the injuries suffered, and we cannot say that the errors we have pointed out did not directly tend to increase the amount of the verdict. We cannot hold, therefore, that these errors were not prejudicial to appellant on the question of the amount of the damages awarded. Under the circumstances of this case these particular errors affecting the amount of the verdict cannot be disregarded under the provisions of section 4½ of article VI of the Constitution of California.

■ "As we have seen, the record before us leaves no doubt in our minds that the negligence of the driver of appellant's stage was the sole and proximate cause of the injury to respondent. No good cause appears to set aside the verdict in so far as it fixes upon appellant liability for the accident. The court can reverse the judgment and remand the cause to the lower court for a new trial solely upon the issue of the amount of damages. (*Morris* v. *Standard Oil Co.,* 188 Cal. 468 [205 Pac. 1073]; *Livesey* v. *Stock,* 208 Cal. 315 [281 Pac. 70]; *Davis* v. *Renton,* 99 Cal. App. 264 [278 Pac. 442].)"

The judgment is therefore reversed and the cause is remanded for a new trial solely upon the issue of the amount of damages, with directions to the trial court to render judgment in favor of the respondent for the amount of damages so found upon a determination of that issue.

Rehearing denied.