[L. A. No. 29652. In Bank. Nov. 26, 1969.]

DONALD W. CUNNINGHAM, Plaintiff and Respondent, v.
RUSSELL SIMPSON et al., Defendants and Appellants.

**COUNSEL**

Walker & Walker and Charles Z. Walker, Jr., for Defendants and Appellants.

James A. Gordon, Jr., for Plaintiff and Respondent.

**OPINION**

**TOBRINER, J.**—Defendants Russell Simpson and Farmers and Merchants Bank of Long Beach appeal from a judgment, entered pursuant to a jury verdict, awarding plaintiff $25,000 for damages resulting from a slanderous statement. We have concluded that although the evidence sufficiently supports the jury finding of liability, the amount of awarded damages, in light of the competent evidence, is excessive.

Plaintiff, a former car dealer in Long Beach, bought a 1958 Thunderbird automobile from Virgil Slater in Wichita, Kansas, and agreed to pay the purchase price of $1,950 by draft drawn by Slater through defendant Farmers and Merchants Bank of Long Beach. Plaintiff, in possession of documents showing him to be the car's purchaser, drove the automobile to Long Beach while Slater forwarded the transfer documents, including a certificate of legal title, and the bank draft to the main branch of defendant bank located at 3d and Pine Streets in Long Beach. In Long Beach plaintiff advertised the car for sale; Lew Mahieu answered the advertisement and agreed to purchase the automobile for $2,250. Plaintiff thus was to reap a $300 profit from the transaction.

In order to arrange financing for the sale plaintiff and Mahieu went to a branch of the Farmers and Merchants Bank located at 14th and Long

Beach Boulevard, where they contacted defendant Simpson, the loan officer for that branch. At trial both plaintiff and Mahieu testified that they had previously known Simpson; plaintiff further testified, however, that at the meeting Simpson "acted like he didn't know me, for some strange reason" and Mahieu introduced the two. The three men discussed the price of the automobile and Simpson examined the vehicle.

Simpson thereafter asked plaintiff as to the location of the title papers for the car; plaintiff explained that they were at the bank's main branch. Simpson allegedly responded by turning to Mahieu and saying: "I told you so." Plaintiff, not understanding the meaning of that remark, attempted to clarify his prior explanation, disclosing the Wichita purchase transaction. Plaintiff asked Simpson to instruct the main office to transfer the draft to Simpson's branch and offered to pay the $5 service charge for the transfer. Simpson called the main branch and learned that plaintiff's title was in order, but apparently continued to refuse to make arrangements to finance the car until plaintiff actually brought the draft to his branch. There was no explanation at trial for this insistence.[1]

By this time Mahieu was becoming upset because the arrangements were taking so long. It was at this juncture, according to plaintiff, that Simpson uttered the slanderous statement. Simpson allegedly declared: "Well, it's obvious to me you've got a hot title or you'd bring it down here." Plaintiff testified: "I was shocked. I turned to Mahieu. Mahieu looked at me; I looked at him . . . . [W]e got off to the side and I said, 'Listen, Mr. Mahieu, I am sorry about this.' "

On direct examination defendant Simpson concurred with plaintiff's general chronology of the meeting but emphatically denied making any remark concerning a "hot title." On cross-examination, the following colloquy occurred: "Mr. Simpson, when Mr. Cunningham returned the morning of the next day, which would be approximately May 2nd of 1961, you asked him did he have the title, right? And when he said no, was that the time you said, 'It's obvious that you have a hot title or you would bring it down here?' " Simpson answered: "That is not the time." Plaintiff's attorney continued: "That's not the time you said that?" Simpson responded: "Whoops, whoops, whoops. I did not say that."

At trial Mahieu also substantiated the general description of the meeting set out above, but he testified that he did not "believe" that he heard the phrase "hot title" used during the conversation. On cross-examination,

---

[1]Simpson admitted, when asked a hypothetical question on cross-examination, that if a title were being held by a finance company that told him that title was being retained in their office, he would normally not require the title to be sent to his bank office.

Mahieu admitted that he was currently financing a car through the defendant bank.

Plaintiff testified that after the meeting in question he was unable to obtain money to pay off the draft, the transaction with Mahieu fell through, and he finally was compelled to sell the car to a dealer for $1,950, his original purchase price. No problem concerning title ever arose. Plaintiff also testified that as a result of his problems with defendant bank, his supplier, Slater, refused to enter into any further business transactions with him, and friends who had promised to advance him $40,000 to begin his own business had withdrawn their commitments.

The jury returned a verdict for the plaintiff in the amount of $25,000, and defendants moved for judgment notwithstanding the verdict and for a new trial. The trial court denied the motions and entered judgment on the verdict. This appeal followed.

Defendants present three arguments on this appeal: (1) Plaintiff failed to prove the facts necessary to constitute a cause of action for slander; (2) the utterance of Simpson, if rendered, was privileged; and (3) the trial court abused its discretion in declining to find the damages excessive.

■ In considering defendants' first argument that the evidence did not as a matter of law sufficiently support the jury verdict, we note, of course, that "[i]n reviewing evidence on appeal, an appellate court will not disturb a verdict if the evidence which supports it is in conflict. The presumption is in favor of the judgment, and the appellate court must consider the evidence in the light most favorable to the prevailing party. All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict." (*Boyle* v. *Hawkins* (1969) 71 Cal.2d 229, 235 [78 Cal.Rptr. 161, 455 P.2d 97]; 3 Witkin, Cal. Procedure (1954) Appeal, § 84 et seq., pp. 2245-2257, and cases cited.)

■ Plaintiff testified that defendant Simpson stated, in the presence of a third person, Mahieu, that: "[I]t's obvious to me you've got a hot title or you'd bring it down here." This accusation that plaintiff possessed a "hot title" could reasonably be understood to imply that the plaintiff had acquired the car by some illegal means[2] and as such would constitute a slander as defined by section 46 of the Civil Code.[3] To be actionable, however, such

---

[2] At trial Mahieu testified that he understood the phrase "hot title" to mean stolen title.

[3] Section 46 provides in relevant part: "Slander is a false and unprivileged publication, orally uttered . . . which: 1. Charges any person with crime, or with having

statements must be published, and defendants suggest that the evidence does not sufficiently support a finding of publication.

The courts have generally held that utterance of a slanderous statement to a single third person constitutes publication (*Harris* v. *Zanone* (1892) 93 Cal. 59, 69 [28 P. 845]); in the instant case plaintiff testified that when Simpson accused plaintiff of having a "hot title" Mahieu was present at, and participating in, the conversation.[4] Plaintiff also testified that Mahieu reacted to the statement in a manner that would suggest that he had heard and understood the accusation. He recalled: "I turned to Mahieu. Mahieu looked at me; I looked at him . . . . [W]e got off to the side and I said, 'Listen, Mr. Mahieu, I am sorry about this.' " Although Simpson denied making the statement, and Mahieu testified that he did not recall the use of those words, the jury had a full opportunity to examine the demeanor of all the witnesses to determine who was telling the truth. (Evid. Code, § 780.) Simpson's testimony was certainly self-serving; Mahieu's continuing business relations with the defendant bank also cast some doubt on his reliability. Although the evidence of publication in this case is concededly not very strong, it was sufficient for submission to the jury. We can find no precedent for defendant's contention that a slandered individual's testimony of publication is insufficient, as a matter of law, without corroboration. (Cf. *Tocker* v. *Great Atlantic & Pac. Tea Co.* (D.C. App. 1963) 190 A.2d 822, 824.) The slander heard by one person is no less a slander than that heard by a multitude.

█ Defendants' second contention, that Simpson's statement, if made, enjoyed the privilege provided by section 47, subdivision 3, of the Civil Code,[5] fails in the face of the jury determination of malice. The undisputed evidence reveals that Simpson served as the loan agent of the defendant bank, a bank which had been requested by plaintiff and his customer to arrange the financing on an automobile sale. Under these circumstances, defendants, as well as Mahieu, were, indeed, persons "interested" in the state of the title of the automobile, within the meaning of section 47, subdivision 3(1). (Cf. *McMann* v. *Wadler* (1961) 189 Cal.App.2d 124,

been indicted, convicted, or punished for crime; . . . 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; . . ."

[4]Cf. *Gelhaus* v. *Eastern Air Lines* (5th Cir. 1952) 194 F.2d 774, 775-776.

[5]Section 47 provides in relevant part: "A privileged publication . . . is one made . . . 3. In a communication, without malice, to a person interested therein (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

129 [11 Cal.Rptr. 37].)[6] Section 47 provides only a conditional privilege for defendants, however, and in this case the court properly instructed that the privilege would be defeated if the jury found that defendant's utterance of the statement had been actuated by malice.

■ Defendants insist that no evidence introduced at trial could support a jury determination of malice. Plaintiff's version of the conversation in question, however, if believed by the jury, provides adequate grounds to show that Simpson may have been motivated by a "wish to vex, annoy or injure" the plaintiff.[7] Plaintiff testified that although he and Simpson had been acquainted for 9 or 10 years, on the day of the alleged slander Simpson pretended not to know him. Then, during the meeting, Simpson addressed various asides to Mahieu ("I told you so") indicating that Simpson had previously talked about plaintiff with Mahieu and implying that Simpson had earlier expressed a negative opinion of plaintiff. Moreover, Simpson admitted that after he had ascertained by phone that plaintiff's title was in order he had refused to proceed with the financing arrangements even though pursuant to normal practice he would accept such verification. The defendant loan agent failed to explain this discriminatory treatment. Given this evidence, we cannot say that the jury's implied finding of malice lacks an evidentiary basis.

■ We have concluded that the award of $25,000 in damages was excessive[8] and that the trial judge's refusal to reduce the award or to grant a new trial constituted an abuse of discretion. ■ "In considering whether the [award was] excessive, we realize the very familiar rule that to the jury, to a very large extent, is committed the responsibility of awarding compensation for an injury sustained. When the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, the duty is

---

[6]Since we reach this conclusion from the undisputed facts as a matter of law, we note that if defendants had requested an instruction taking the issue of privilege from the jury and limiting the jury to the question of malice, such an instruction would have been proper. (See *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 416-417 [46 Cal.Rptr. 135].) In this case, however, defendant did not so request that charge but rather asked that the issue of privilege be submitted to the jury as a whole.

[7]This expression was the definition of malice given to the jury at defendant's request.

[8]Plaintiff's complaint prayed for $300 actual damages, $25,000 general damages, and $25,000 exemplary damages. The jury "assess[ed] damages in the amount of $25,000" without segregating the amounts attributable to general or exemplary damages. Defendants cannot now claim prejudice from the ambiguous nature of the verdict, however, as they failed to request a segregation of the damages before the trial court. (See *Foley* v. *Martin* (1904) 142 Cal. 256, 261 [71 P. 165, 75 P. 842, 65 Am.St.Rep. 147]; *Turner* v. *Whittel* (1934) 2 Cal.App.2d 585, 590 [38 P.2d 835]; *Baker* v. *Peck* (1934) 1 Cal.App.2d 231, 237-238 [36 P.2d 404].)

then imposed upon the reviewing court to act." (*Rosenberg* v. *J. C. Penney Co.* (1939) 30 Cal.App.2d 609, 628 [86 P.2d 696].)

Plaintiff testified that as a result of Simpson's slanderous remark Mahieu refused to proceed with his agreement. Subsequently, plaintiff sold the automobile in question at his own cost. The loss of the $300 profit on this transaction could properly have been found by the jury to have been caused by the slander.

Plaintiff also testified that he sustained additional damages when Slater, the midwest auto wholesaler, refused to transact any further business with him. Plaintiff attributed the cause of the cessation in dealings to a telephone call Slater made to defendant bank: "[H]e called out here and whoever he talked to at the bank, he told me they scared him off. He didn't want nothing to do with me." Plaintiff introduced absolutely no evidence, however, to connect Simpson's slanderous statement to the Slater telephone call. Plaintiff conceded that Slater had spoken to some bank official at the main branch, not at Simpson's branch; no competent evidence indicated that either Simpson or Mahieu had republished the statement to anyone.

Similarly, plaintiff's alleged loss of $40,000 in capital "committed" to him[9] also was not linked in any manner to the slanderous statement. Plaintiff introduced no evidence at trial to show that Simpson's remark obtained general publication. In determining the damage that flowed from defendant's statement, we do not believe that the jury, in the absence of evidence of general publication, could properly take into account these remote losses plaintiff allegedly sustained. (See *Biggins* v. *Hanson* (1967) 252 Cal.App.2d 16, 24 [59 Cal.Rptr. 897]; cf. *Mahana* v. *Echo Publishing Co.* (1919) 181 Cal. 233, 236 [183 P. 800].)

The $300 loss on the Mahieu sale thus becomes the only actual damage related to the slander which was disclosed at trial. It is true, of course, that upon proof of actual damage in an action for slander (Civ. Code, § 46, subd. 5) the jury, in awarding general damages, may consider plaintiff's loss of reputation, shame, and hurt feelings (see Rest., Torts, § 621 and comment; *Di Giorgio Fruit Corp.* v. *American Federation etc. Organizations* (1963) 215 Cal.App.2d 560, 576-578 [30 Cal.Rptr. 350]). The slander in the instant case, however, involves only a publication to a single individual who, at best, bore a rather remote relationship to plaintiff.

Although the award of damages in the instant case might also properly have included some measure of exemplary damages "for the sake of example

[9]Although the record is not free from ambiguity, these "commitments" do not appear to have been donations promised to plaintiff, but investments in a business operation plaintiff was "promoting." The loss of such "commitments" therefore cannot be interpreted as equivalent to the loss of a $40,000 profit.

and by way of punishing the defendant" (Civ. Code, § 3294), the defendant's conduct, even though found to have been actuated by malice, falls considerably short of the aggravated nature of activity involved in other cases in which courts have found comparable or smaller damage awards to be excessive. (See, e.g., *Rosenberg* v. *J. C. Penney Co., supra,* 30 Cal.App. 2d 609, 628 (libel published on sign in department store window for one day; $10,000 general damages reduced to $5,000, $15,000 exemplary damages reduced to $5,000); *Collins* v. *Brown* (D.D.C. 1967) 268 F.Supp. 198 (defendant falsely accused plaintiff-attorney of racial prejudice and fraudulent prosecution of claim, causing several thousand dollars of actual damages to plaintiff; $30,000 punitive damages award found excessive because defamatory statement communicated to only one individual who in turn transmitted it to only one other person); *Fitzgerald* v. *Hopkins* (1967) 70 Wash.2d 924 [425 P.2d 920] (established sculptor defamed a beginning artist, labelling him a thief "who robs openly from a creative spirit"; $15,000 unsegregated verdict found excessive by $7,500); *cf. Luke* v. *Mercantile Accept. Corp.* (1952) 111 Cal.App.2d 431, 438-439 [244 P.2d 764] (defendant converted plaintiff's car and maliciously attempted to compel plaintiff to pay off indebtedness; $580 general damages found proper, $2,500 exemplary damages held excessive).)

■ The record suggests, moreover, that a motivating force for such a verdict may not have been the strength of plaintiff's case but, instead, the jury's antipathy for defendant. The trial judge, in denying defendant's motion for judgment notwithstanding the verdict, commented: ". . . I'm sure that Mr. Simpson made a very poor impression . . . on the jury. He is arrogant in his manner, and his whole attitude and demeanor was such as to lend credence to the fact that this is the very thing he did. I'm sure that's what motivated [the jury]." Thus we believe that the motivation of the jury in granting this disproportionate award of $25,000 must have been "passion [or] prejudice." (*Morris* v. *Standard Oil Co.* (1922) 188 Cal. 468, 473 [205 P. 1073]; *Washer* v. *Bank of America Nat. Trust & Sav. Assn.* (1948) 87 Cal.App.2d 501, 510 [197 P.2d 202].)

■ Having concluded that the jury verdict is excessive, this court may (1) remand for a new trial on all issues (see, e.g., *Rhodes* v. *Naglee,* 66 Cal. 677, 681 [6 P. 863]) or on the issue of damages alone (*Pretzer* v. *California Transit Co.* (1930) 211 Cal. 202, 209 [294 P. 382]), or (2) issue a remittitur conditioning affirmance of the judgment on plaintiff's agreement to remit part of the award (see, e.g., *Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 120-121 [130 P.2d 389]; *Stevens* v. *Snow* (1923) 191 Cal. 58, 68 [214 P. 968].) Since in the instant case a legitimate award would embrace any provable damages for injured feelings and sensibilities as well as exemplary damages, about which it would be difficult for us even to speculate, we shall

not attempt to set the amount of the remittitur ourselves, but instead remand for a new trial on the issue of damages. This procedure will enable each party to adduce a full showing as to this issue and will provide the safest and most complete means for its exposure in all its phases.

That portion of the judgment ordering that petitioners shall recover the sum of $25,000 together with the costs of suit from respondents is reversed with directions that the trial court retry, in accordance with the views herein expressed, the issue of damages. In all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

Traynor, C. J., Burke, J., and Sullivan, J., concurred.

**MOSK, J.**—I concur in the affirmance of the judgment on the merits, but I dissent from the reversal on the issue of damages.

A jury and a trial judge considered general and punitive damages and concluded the sum of $25,000 to be appropriate. The trial judge considered and denied a motion for judgment notwithstanding the verdict and a motion for a new trial. Unless the amount of the judgment shocks the conscience, a reviewing court has no right to substitute its views of the facts for those of the trial court. The majority do so here, contrary to well-settled rules of law.

"The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented it becomes his duty to reduce them. . . . An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors." (*Holmes* v. *Southern Cal. Edison Co.* (1947) 78 Cal.App.2d 43, 51-52 [177 P.2d 32]; *see, e.g., Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 263 [73 Cal.Rptr. 127]; *Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) 215 Cal.App.2d 560, 580-581 [30 Cal.Rptr. 350]. The matter was stated even more succinctly in *Morris* v. *Standard Oil Co.* (1922) 188 Cal. 468, 473 [205 P. 1073]: "The question of excessive damages is one that is first addressed to the trial court. Practically, the trial court must bear the whole responsibility in every case."

Part of the damages awarded here were punitive. Again, the law on this subject is clear. "[The jury's estimate] of what would be sufficient as a

punishment and a deterrent and an example was very high as compared with the actual damages assessed and high from any point of view, but it would hardly be candid to invite them . . . to fix such sum which expressed their judgment in such matter, and then charge them with bias or perversity because the measure of their abhorrence of defendant's conduct and their judgment of what would be a sufficient punishment and deterrent was represented by a larger sum of money than that which some other man or men would have allowed." (*Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) *supra,* 215 Cal.App.2d 560, 581, quoting *Scott* v. *Times-Mirror Co.* (1919) 181 Cal. 345, 367 [184 P. 672, 12 A.L.R. 1007].)

It is common knowledge that we currently live in a period of persistent inflation. The cost of living index, as reported by the United States Department of Labor and reflected in private and public salaries—including those of judges—has been steadily rising.[1] It is not improvident for the jury and trial judge here to find that the current market rate of injury to reputation, shame and hurt feelings has also risen substantially.

I suggest that my colleagues, in evaluating damages, are clinging to standards of two or three decades ago. Indeed, on the subject of excessive damages the majority cite only three California cases: *Rosenberg* v. *J. C. Penney Co.,* 30 Cal.App.2d 609 [86 P.2d 696], *Washer* v. *Bank of America,* 87 Cal.App.2d 501 [197 P.2d 202] and *Luke* v. *Mercantile Acceptance Corp.,* 111 Cal.App.2d 431 [244 P.2d 764]. *Rosenberg* was decided in 1939, *Washer* in 1948 and *Luke* in 1952. The dollar is a much different commodity in 1969, and as a result the sum awarded to plaintiff will cause very little concern to the defendant bank and its culpable employee. "In assessing [punitive] damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff which the defendant caused or intended to cause, and the wealth of the defendant." (Rest., Torts, § 908.)

Indeed, the defendants stressed other issues and referred to excessiveness of damages most casually. While they suggested in their opening brief in the Court of Appeal—but at no time since—that the trial court had failed to consider the issue in post-trial motions, the record clearly indicates the judge gave thoughtful consideration to defendants' contention. In any event defendants have not met their burden in this court of demonstrating the

---

[1]The persistence of inflation, even in periods of peace and prosperity, has confounded some economics experts. But in relative good times and bad, inflation has been strongly manifest in the United States ever since the end of World War II. Steel prices, a barometer of the nation's economy, have doubled each decade. In recent years the levels of living costs have reached new highs "month after month with monotonous regularity." (Galbraith, The Affluent Society (1958) 210 ff.)

excessiveness of damages. As we said in *Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 356 [282 P.2d 23, 51 A.L.R.2d 107]: "Since defendants' claim of excessive damages is primarily factual in nature, they are required to set forth in their briefs all the material evidence on the point, and unless this is done their contention is deemed to be waived."

I would affirm the judgment in its entirety.

McComb, J., and Peters, J., concurred.

Respondent's petition for a rehearing was denied December 23, 1969. McComb, J., Peters, J., and Mosk, J., were of the opinion that the petition should be granted.