Opinion
DOZIER, P. J.
Case Background
Plaintiffs, Mr. and Mrs. Woolstrum, while proceeding in a station wagon in a southerly direction on Watkinson Road in northern San Joaquin County on January 15, 1980, were involved in a collision with a black cow belonging to defendant rancher, Denis Mailloux. The cow escaped from defendant’s enclosed pasture adjacent to the highway through an accidental opening in the fence, striking the station wagon on the right passenger side (Mrs. Woolstrum’s side, Mr. Woolstrum was driving).
A complaint was filed in Lodi Municipal Court on July 22, 1980, for injuries and damages sustained as a result of defendant’s negligence. A first amended complaint was filed April 28, 1981, requesting an award of punitive damages. The complaint alleged defendant was aware of the disrepair and inadequacy of his fence at the break and failed to act to repair it.
The complaint further alleged that defendant’s failure to correct the known disrepair of the fences was wilful and malicious, warranting a punitive damage award.
*Supp. 3 Following trial in Lodi Municipal Court (Baysinger, Judge Pro Tem.), judgment was entered for the plaintiffs on a unanimous speciál verdict. The jury found that plaintiff had suffered compensatory damages of $5,059.38 and punitive damages of $1,500. Judgment was awarded for $6,559.38 and plaintiff Larry Woolstrum was further awarded one-half of the costs of the suit, $311.51. The jury also found defendant to have been malicious in his conduct against Donna Woolstrum and that plaintiff Donna Woolstrum had suffered compensatory damages of $3,500 and punitive damages of $1,500.
Following trial, defendant filed a motion for judgment notwithstanding the verdict and a motion for a new trial.
A hearing on these issues was held in Lodi Municipal Court (Baysinger, Judge Pro Tem.). Judge Baysinger denied the motion for a new trial and judgment notwithstanding the verdict.
Defendant now appeals. The appeal is submitted on a settled statement of facts which reveals the following information.
Settled Statement of Facts
Plaintiff Larry Woolstrum testified that he was operating his father’s 1967 station wagon south on Watkinson Road, when a black cow ran onto the road and struck the passenger side of the station wagon. The accident occurred between 8:30 and 9 p.m. Mr. Woolstrum did not observe any cows prior to the accident. Six to eight other cows were observed wandering on the roadway following the collision.
Mr. Woolstrum additionally testified that, following the collision, he investigated the fence west of the highway (defendant’s fence), and observed a hole in the fence with two or three wooden boards on the ground inside the opening. The boards appeared to be old and worn; the heads of the nails attaching the boards were rusted away and the nail holes were, in places, larger than the nails. When plaintiff and his father subsequently herded the cattle back in, they had to drive new holes in the boards to reattach them to the fence. The fence in this area lacked the barbed wire that existed in the rest of the fence.
Richard Woolstrum, Larry’s father, testified that he went to the accident scene after being called by his son, Larry. He identified exhibit 1,1A as scenes of the accident. He then testified that he observed the opening in the fence, that three to four worn, rotten wooden boards were on the ground near the opening.
Testimony was given by Steve Lincoln, defendant’s neighbor directly to the north along Watkinson Road. Mr. Lincoln indicated that he and defendant were *Supp. 4 the only cattle ranchers among the adjacent landowners. Prior to the accident, he observed cattle loose on Watkinson Road, but could not identify whose they were. Subsequent to the accident on October 25,1980, he returned several head of cattle to defendant’s enclosure. Mr. Lincoln testified that he was familiar with the condition of defendant’s fence prior to and on January 15, 1980; that all fences need occasional repairs; that the condition of defendant’s fence was such that, had it been his, he would have made repairs.
Testimony was given by Stan Frazier, a farmer directly opposite defendant on the east side of Watkinson Road. Mr. Frazier testified that he observed two or three cattle wandering on Watkinson Road during the summer of 1979. He could not identify them, however, on one occasion one cow jumped from the road onto defendant’s property after being herded there by a teenage girl. In that area, the road was at a higher elevation than the field by three and one-half to four inches.
The defendant, Denis Mailloux, testified as follows. He has been employed as a bar owner and part-time rancher for the past 10 years. His 10-acre ranch is located between Suttenfield Road and Watkinson Road. The maintenance of the fences was a primary job at the ranch. They were examined daily by the defendant, who stated he did not find any obvious disrepair on or before the date of the accident. The fences were checked by persons walking around them or riding around them on a horse. (Defendant employed one Joe Thiel to assist him on the ranch.)
The fence at the southeast comer facing Watkinson Road was at least four feet high. It was constmcted of four boards and two strands of twisted wire. The strands of twisted wire were approximately two feet off the ground at their highest point. Defendant testified that he had checked this section frequently, along with the rest of the fence. Defendant placed boards on the fence approximately nine to ten years ago, replacing the existing barbed wire. He believed they had since been replaced twice in order to shorten the gate and make the fence stronger. The section of fence in question is a brace between the comer of the fence and a gate approximately 10 feet north of the southeast comer. Defendant testified that the boards were necessarily used in order to provide a brace for the fence comer there. Boards are not used to provide braces at other corners. Additionally, defendant testified that, because of the wood, it was unnecessary to have high strands of barbed wire.
Defendant is an experienced rancher. He stated that he has found other people’s livestock in his pasture in the past and returned them to their owner’s pasture.
*Supp. 5 Defendant testified that he consistently carried out necessary repairs. The last repairs were completed two months before the accident when several wires were tightened. Following the accident, some of the same boards were reused and hogwire was added to strengthen the fence.
Mr. Mailloux also testified that cattle had escaped from his enclosures five or six times during the past ten years, though not within the past year (and not at the fence comer in question).
Mrs. Mailloux told Mr. Richard Woolstrum that evidently their cows got out through their fence and that such a thing was a common occurrence associated with raising cattle. She was aware of one other escape during the four years she lived at the ranch, when a calf escaped onto neighboring property. She remembered her husband stating that he had chased a cow with a tractor down Jahant Road and back onto their ranch. Mrs. Mailloux testified as to her husband’s diligence in maintaining and repairing the fence.
The Law of Punitive Damages
The most recent California case discussing the propriety of granting punitive damages in a negligence (or products liability) case was Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171]. The court summarized the rule as follows:
In order to justify punitive damages in such cases, the evidence must show that the defendant (1) knew of the (2) probable injurious consequences of his conduct and (3) deliberately failed to avoid them.
The expression of the mle was first clearly stated by Justice Friedman in G. D. Searle & Co. v. Superior Court (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218], where the court held that punitive damages could be awarded in a negligence case if the defendant (1) consciously disregarded the (2) probability of (3) a known substantial danger of injury to others.
The types of testimony necessary to sustain an award of punitive damages is illustrated by:
1. Nolin v. National Convenience Stores, Inc. (1979) 95 Cal.App.3d 279 [157 Cal.Rptr. 32]—In Nolin, defendant operated a convenience store which included self-service gasoline pumps. Defendant was repeatedly advised by his employees over a four to five month period of a malfimction in the nozzle of one pump which caused the pump to overflow when in use, spilling gasoline on the ground. Store employees testified that they had repeatedly requested repair; one ineffective attempt to repair was made; defendant was advised of two *Supp. 6 separate incidents of people slipping and falling in the pump area prior to the plaintiff’s fall. Defendant required the store manager to remove warning signs placed at the pumps and to stop advising patrons of hazards in the pump area over a loudspeaker; or
2. Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171]—In Hasson, the Ford manager testified that Ford (a) knew of the fluid boil problem, (b) failed to warn in order to protect reputation of the Continental, (c) knew there would be no brakes whatever if boil occurred, and (d) consciously disregarded that danger in not putting in dual master cylinders; or
3. Grimshaw v. Ford Motor Co. (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348]—In Grimshaw evidence was presented that Ford, as a result of crash tests, knew that the Pinto’s fuel tank and rear structure would expose consumers to serious injury or death at low speed collisions; that Ford could have corrected the hazardous design defects at minimal cost but (balanced) human lives and limbs against corporate profits (and did not). Ford’s institutional mentality was shown to be one of callous indifference to public safety. (Id., at p. 813.)
In Taylor v. Superior Court (1979) 24 Cal.3d 890, 895 [157 Cal.Rptr. 693, 598 P.2d 854], the court, in essence, stated that the spirit of the legal principle justifying punitive damages (evil motive) is violated by granting such damages because of reckless conduct. Even the most confirmed cow hater would not argue that Mailloux’s conduct was worse than reckless.
Note that each of these cases falls neatly into the “outrageous conduct” category proposed by Prosser. (See Prosser, Law of Torts (4th ed. 1971) p. 9.)
Even in Seimon v. Southern Pacific Transportation Co. (1977) 67 Cal. App.3d 600 [136 Cal.Rptr. 787], the strongest precedent for the plaintiff in the present case, the appellate court emphasized that there existed:
1. A peculiarly dangerous railroad crossing;
2. Knowledge by the defendant of the exact condition of the crossing and its dangerousness;
3. A decision by the defendant to take no steps to reduce the peril even by placing working signs or lights. In such cases, the evidence is such that, despite defendant’s denial of a conscious disregard of a probable known danger, it is reasonably and obviously inferable that defendant must have known of the danger and its extent and decided to disregard it.
*Supp. 7 Comparison of Woolstrum with Above Cases
In the present case, although there was evidence that defendant’s cows had escaped several times over the past 10 years, there was no evidence that the escapes occurred at the scene of the present disrepair. Far from being a proven dangerous substance, the cows, even on escape, had never caused injury or property damage. There was no evidence whatsoever that the defendants had observed that the portion of the fence possibly broken down by a cow was about to fail. Indeed, there was no evidence that it was about to fail because there was no evidence how the boards were dislodged. There was evidence that no break had previously occurred at that location.
The defendant and his wife testified to their vigilant observations to try to maintain a safe fence. There was no evidence that they failed to do so other than the presence of some rusty nails (inevitably outdoors), some overly large deteriorated nail holes and some boards on the ground (curiously enough inside the fence). There was no evidence that the boards had been off the fence any appreciable length of time.
This was enough for the jury to properly find simple negligence and compensatory damages.
It is obviously insufficient for the leap the jury made that the fact a couple of fallen boards had loose nail holes proved the inferences of a (1) conscious disregard by defendant of a (2) known (3) probable likelihood of injury to others. The meagre facts shown here, plus logical inferences permissible therefrom, are ludicrously insufficient to justify the imposition of punitive damages.
This was a garden variety negligence action. Recoveries for injuries due to failure-to-repair negligence based on a farmer’s inadequate fence are common. (See Summers v. Parker (1953) 119 Cal.App.2d 214 [259 P.2d 59].) These are often close cases depending on proof of lack of a maintenance program by defendant or an obviously failing structure. In the present case, the plaintiffs prevailed in what appears to have been a close case as to even ordinary negligence.
Unless we are to remove all distinction between what proof is necessary in a negligence case in order to recover punitive damages as distinguished from compensatory damages, we cannot let the verdict for punitive damages stand.
The only California case which graphically demonstrates the vigilant attitude the judiciary must exercise in controlling aberrant punitive damage awards in negligence cases is Colson v. Standard Oil Co. (1976) 60 Cal.App.3d 913 [131 Cal.Rptr. 895].
*Supp. 8 Colson involves a plaintiff employed by contractor X, utilized by defendant Standard Oil to repair a road on its refinery property, being injured by the explosive leaking of sulfuric acid from a shallowly buried underground Standard Oil pipeline on its property.
The court first analyzed the facts more closely than usual for an appellate court and instead of just summarizing the fact offered by the two sides compared the weight of the opposing evidence and the extent to which the defendant’s version nullified the plaintiff’s version.[1]
The court, while recognizing the traditional rule applicable to the granting of a directed verdict (i.e., resolve conflicting evidence in favor of plaintiff and give his evidence its full possible value), in effect did not accept the reasonableness of the inferences drawn by the jury and held that as a “matter of law the evidence of the plaintiff fell far short of showing a wanton disregard by defendant of a probable” injury.
In the early days in California under the “open range” laws, a rancher did not have to fence his cattle in and it was incumbent on the rare motorist to “watch out for the cows” (as well as the deer). Urbanization and proliferating automobiles led to the requirement that the rancher fence his land and exercise ordinary care to keep his cows inside. In the present case, the wheel has come full circle and the jury has decided that this obligation of the tiny minority of *Supp. 9 farmers be enforced by imposing on them punitive damages if they fail to exercise whatever care is necessary to keep the pesky cattle confined.
This is, in effect, a policy decision,[2] as the evidence is not even close to showing that the defendant knew his fence was dangerously weak (in a place where no break had ever occurred) and that he consciously disregarded the probability (not possibility) that a cow would lean against it and that, if it did, the cows would escape and probably (not possibly) cause a serious accident.
Necessity of Judicial Control of Punitive Damage Awards
This case is a striking illustration of the necessity of trial and appellate courts exercising the vigilance of a hawk in properly confining juries to their assigned role in negligence cases where punitive damages are claimed, as they are now in a burgeoning percentage of cases. Except for automobile accident cases, punitive damages are now sought in the majority of all negligence cases, as any harried law and motion trial judge can attest.
Many of the evils[3] of our system of allowing juries unfettered discretion in awarding, in negligence cases, punitive damages (and the amount thereof) have been pointed out by courts and commentators.
The law does not favor the imposition of punitive damages. They should only be allowed in the “clearest of cases.”
In Beck v. State Farm Mut. Auto. Ins. Co. (1976) 54 Cal.App.3d 347 [126 Cal.Rptr. 602], the court struck an award of punitive damages based on insurer’s bad faith. In reversing the award because of insufficient evidence, the court noted that, “[t]he law does not favor punitive damages and they should be granted only with the greatest caution.” (Id., at p. 355.)
Although punitive damages are designed to deter misconduct, there is no good proof that they do (see Owen, Punitive Damages in Products Liability Litigation (1976) 74 Mich.L.Rev. 1258).
*Supp. 10 The deterrent effect of punitive damages in a case of ordinary negligence is dubious because negligence is by definition unintentional (see generally Prosser, Law of Torts, supra, at p. 9).
Forceful arguments have been made that the remedy of punitive damages, in negligence cases, should be abolished. (See, e.g., Murphy v. Hobbs (1884) 7 Colo. 541 [5 P. 119].) In Fay v. Parker (1873) 53 N.H. 342, the court concluded that “[t]he idea [punitive damages] is wrong.”
However, punitive damages date back to the Code of Hammurabi (2000 B.C. —see Owen, 74 Mich.L.Rev. at p. 1262) and are likely to be around for some time.
To contain the generosity and emotionality of juries, appellate courts have set the threshold high in defining situations in which punitive damages can be given. Conduct which may be characterized as unreasonable, negligent, grossly negligent or reckless does not satisfy the highly culpable state of mind warranting punitive damages. (G. D. Searle & Co., supra, 49 Cal.App.3d 22.) Conduct which warrants punitive damages must be of “such severity or shocking character [as] warrants the same treatment as accorded to willful misconduct-conduct in which defendant intends to cause harm.” (Nolin v. National Convenience Stores, Inc., supra, 95 Cal.App.3d 279, at p. 286; italics added.)
The trial and appellate judges should insist that no instructions be given as to punitive damages and no such award be permitted to stand unless there is tangible evidence of each of the trilogy elements delineated in G. D. Searle & Co., Taylor, and Hasson. If, from the mere existence of a defect for a substantial period of time, the jury is permitted to draw an inference of the existence of all three requirements, the restrictive rule might as well be thrown out of the window.
The evidence in the present case is a light year away from Nolin, Hasson, and Grimshaw.
There is evidence that the nail holes were deteriorating and the defendant should have observed it. There is no evidence that he did observe it, or that it was ever pointed out to him, or that it was so obvious that he must have noticed, or that cows had ever escaped at tiiat location. If a jury can be permitted to infer the three essential requisites for punitive damages—that defendant (1) knew of the defect, (2) that injury was probable, and (3) consciously disregarded it—from the evidence in this case, then there is scarcely a case in the land of failure to perceive and repair where a jury wishing to create a policy—here “keep your d---cows off our highways”—could not grant punitive damages.
*Supp. 11 Taylor v. Superior Court (1979) 24 Cal.3d 890 [157 Cal.Rptr. 693, 598 P.2d 854], is a case in which the Supreme Court writes four pages about the extreme danger of drunken drivers in order to show (1) the need for deterrence (note though that it is the Supreme Court setting policy, not a jury as in our case), and the likelihood of the driver’s awareness of the danger he presents.
But then Justice Richardson adds “ordinarily routine negligent or even reckless disobedience of traffic laws would not justify an award of punitive damages.” (At pp. 899-900; italics added.)
The misuse of punitive damages can become intolerable. The trial judges should employ “vigilant scrutiny” to ensure that the inferences drawn by the jury—that conduct by the defendant, proved in substantial detail, demonstrates the three strict requirements for imposition of punitive damages—are truly sound and reasonable, not reasonable just because the jury may think they are.[4]
Trial and appellate courts have demonstrated their realization that a tighter rein should be employed in punitive damage cases, as compared to other civil cases, by the frequency in which courts have cut down the amounts of punitive damage awards or granted new trials if remittitur is not accepted, as distinguished from the general hands off attitude the courts take toward jury decisions as to compensatory damages. (Grimshaw v. Ford Motor Co. (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348]; Rosener v. Sears, Roebuck & Co. (1980) 110 Cal.App.3d 740 [168 Cal.Rptr. 237]; Little v. Stuyvesant Life Ins. Co. (1977) 67 Cal.App.3d 451 [136 Cal.Rptr. 653]; Cunningham v. Simpson (1969) 1 Cal.3d 301, 310 [81 Cal.Rptr. 855, 461 P.2d 39]; Stevens v. Snow (1923) 191 Cal. 58, 68 [214 P. 968]; Simoneau v. Pacific Electric Ry. Co. (1913) 166 Cal. 264, 279 [136 P. 544] and Salstrom v. Orleans Bar Gold Min. Co. (1908) 153 Cal. 551, 559 [96 P. 292].) Judges should exercise the same care in monitoring the merits of punitive damages.[5]
*Supp. 12 Conclusion
The evidence against the defendant is obviously different in quality as well as degree from Nolin or Seimon. In all of those cases, there was definite evidence that the defendant knew or must have known of the danger and its degree. Here, there is no evidence that the defendant consciously disregarded his obligation to maintain the fence or that he knew or must have known that two boards on a fence hundreds of yards long were weak enough to be dislodged unless the existence of a few deteriorating nail holes can be held to pin upon the defendant the onus of obvious knowledge of the degree of peril and conscious disregard thereof. Drawing such an inference is not reasonable and permitting it would eliminate the distinction between the duty to exercise ordinary care (compensatory damages foundation), and the duty not to consciously disregard the necessity to correct known defects that present a probability of injury to others (foundation of punitive damages).
The decision of the trial court in refusing a judgment notwithstanding the verdict on this issue is reversed. The judgment for compensatory damages is affirmed.
The case is remanded to the trial court with directions to grant a judgment notwithstanding the verdict on the cause of action for punitive damages.
Martin, J., and Cruikshank, J., concurred.

 The appellate account of plaintiff’s testimony showed:
1. Fifty leaks had been reported in the pipeline throughout its life.
2. The line was 20 years old and its life expectancy at the time of the accident could have been measured in months.
3. The defendant knew the roadwork would be in the vicinity of the line.
4. A Standard Oil inspector had recommended replacement of the line.
5. But the company, because of the daily use of the pipe and the loss of profit if the line shut down, decided to “run it to failure.”
6. That the defendant did not post a warning at the work site or place a guard there.
7. The sulfuric acid at the refinery had caused 20 to 25 injuries.
The defendant, on the other hand, showed:
1. That the previous leaks had occurred over a 20-year period and over a line 4 miles long.
2. That all leaks had been promptly repaired on the day of occurrence.
3. That all of the leaks except one or possibly two had occurred at valves or at defective welds, rather than pipe erosion, as in the present case.
4. That the line had a remaining life of four or five years and substantial loss would result from its being shut down for more than repair time.
5. That no leak had ever occurred near the section of the pipe where the plaintiff was injured.
6. That in a far away area where the company had decided to “run to failure” rather than replace (after several ruptures), the company had placed a heavy redwood covering around the pipe.
7. That the defendant company had inspected the whole line with special equipment a few years before the accident and found no need of repair.
8. That in the area where the inspection showed a need for replacement, the company had been quite willing to shut down the line for several days.
9. That of the 32 sulfuric acid injuries in the plant in the preceding 10 years, only one or possibly two occurred because of leaks in the pipeline.

 Policy decisions as to the law adjusting the rights and obligations between farmers and city dwellers should be made by the Legislature (equipped as it is to gather a vast range of facts and receive input from citizens, lobbyists and experts) rather than jurors who are confined to the evidence introduced on the narrow issues of a single case, and the evidence there produced motivated solely by the self-interest of the parties.

 For the convenience of future judicial reflection on the wisdom of punitive damages in negligence cases, we gather the asserted 19 demerits (and 3 merits) of the policy from the American judicial and law review literature in the appendix.

 The inexperience of jurors in deciding questions of punishment and the public policy is so marked and their susceptibility to passion, prejudice and the histrionics of counsel is so great in the arena of punitive damages that two commentators have recommended that the judge, rather than the jury, decide the amount of punitive damages (Dobbs, Handbook on the Law of Remedies (1973) § 3.9, at p. 220 and DuBois, Punitive Damages in Personal Injury, Products Liability and Professional Malpractice Cases: Bonanza or Disaster (1976) 43 Ins. Counsel J. 344, 353).

Analogous are cases of intentional infliction of emotional distress where the trial court does not give the usual deference to the jury as to what conduct is “shocking.” (Bertero v. National General Corp. (1974) 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; Cunningham v. Simpson (1969) 1 Cal.3d 301 [81 Cal.Rptr. 855, 461 P.2d 39]; Merlo v. Standard Life & Acc. Ins. Co. (1976) 59 Cal. App.3d 5 [130 Cal.Rptr. 416] and Forte v. Nolfi (1972) 25 Cal.App.3d 656 [102 Cal.Rptr. 455].)