[L. A. No. 6688. In Bank.—April 23, 1923.]

E. P. STEVENS, Respondent, v. ERNEST SNOW et al., Appellants.

[1] LIBEL—WHAT IT INCLUDES.—Libel includes a publication "which exposes any person to hatred, contempt, ridicule or obloquy" (if false and unprivileged), irrespective of whether or not it charges a violation of law.

[2] ID.—ACTION FOR DAMAGES—PUBLICATION LIBELOUS PER SE—INSTRUCTION.—In an action for damages for libel, an instruction that a publication in the form of a letter signed by the defendants, and published in a newspaper, in effect charging the plaintiff with procuring by crooked methods an unjust change in the boundaries of a school district and with being actuated by bad faith in so doing was libelous *per se*, was correct.

[3] ID.—PRIVILEGE—JUSTIFICATION—PLEADING—WAIVER.—The defense of privilege, like that of justification, must be specially pleaded or it cannot be availed of.

[4] ID.—DEFENSE OF PRIVILEGE — CHARACTER OF.—The defense of privilege is essentially one of confession and avoidance and this is further evidenced by the circumstance that under it the burden of proving the absence of actual malice rests upon the defendant.

[5] ID.—PRIVILEGE—PLEADING—EXCEPTION.—The rule that privilege to be available as a defense must be pleaded is subject to the single exception that when it appears upon the face of the complaint it may be availed of by demurrer; but this exception is limited to cases of absolute privilege under subdivisions 1 and 2 of section 47 of the Civil Code, and this is so because of the fact that in cases of qualified privilege the burden is upon the defendant to prove the absence of malice.

[6] ID.—EFFECT OF ARTICLE UPON PLAINTIFF'S WIFE—EVIDENCE—INSTRUCTION—PREJUDICIAL ERROR.—In such action, the admission over defendant's objection of testimony by plaintiff as to the effect observed by plaintiff of the article upon his wife, and the giving of an instruction to the effect that the jury could take into consideration as an element of damage the mental suffering on the part of plaintiff, if any, growing out of the fact, if found to be a fact, that he was conscious that members of his family suffered by reason of the statements contained in the publication complained of, were erroneous, and such error was prejudicial where a very substantial portion of the award in favor of plaintiff was based upon a consideration by the jury of the testimony improperly admitted and then unduly emphasized and called to the particular attention of the jury by said instruction.

APPEAL from a judgment of the Superior Court of Santa Barbara County. Merle J. Rogers, Judge. Reversed.

The facts are stated in the opinion of the court.

2. What words are libelous *per se*, notes, 1 Am. Dec. 448; 12 Am. Dec. 39; 41 Am. Rep. 390; 116 Am. St. Rep. 802.

3. Privileged communications. expressions, or statements, note, 104 Am. St. Rep. 110.

Ford & Bodkin, G. H. Gould, Harry W. T. Ross and Leon R. Yankwich for Appellants.

John C. Benton for Respondent.

MYERS, J.—Defendants appeal from a judgment for plaintiff upon a verdict in his favor in an action for damages for libel. The action was based upon the following publication in the form of a letter signed by the defendants, and published in the "Santa Barbara Daily News" (the plaintiff and defendants being residents of the Summerland district in the county, of which Santa Barbara is the county seat).

"Through no fault of our own we seem to be dragged into Summerland disputes. If there are factions in that town we are not interested in them. But we are interested in the crookedest deal in the shape of annexation of the territory of one school district to another that was ever put over on the quiet in the state of California. However, when we learn that E. P. Stevens,—Ed Stevens, well known to the readers of the Daily News—worked the thing up and got it done we do not so much blame the public officers who are involved in it.

"What is it that causes a number of the people of Summerland to call us kickers and disturbers because we do not quietly submit to a form of legalized robbery? Let us show you and all fair-minded men and women what was done in November, 1917, without our knowledge and consent and of which we were not informed until we found it out by our tax statements. We cannot on this short notice furnish The Daily News with a plate from which to print a map; but that will be done later when it may do some good.

"This Ed. Stevens, with the help of some others in good faith, drew a description for a petition for annexation to Summerland School District of certain adjoining territory which looks as if it might properly belong to Summerland. The petition upon which the actual change was made was based upon a description altogether different from the original, and we do not know whether that change was made before or after the names were attached, but we do know that persons who assisted with the original description refused to sign the petition.

"Not knowing whether or not we can hope for fair play or a fair hearing in Summerland, we respectfully ask your readers in Santa Barbara, Montecito, and Carpinteria, who may have access to a map of East Montecito to trace out the description of Summerland school district as established two years ago.   Here it is in brief: Beginning at the southeast corner of the Ortega Rancho, and running thence north to the south line of Section 11 (T. 4 N. R. 26 W. S. B. M.), thence east to the southeast corner of section 11; thence north to the northeast corner of section 2 near the summit of the Santa Ynez mountains; thence west to the middle of the north line of section 3; thence south to the pueblo line; thence southeasterly along that line to a point north of lands of Allen S. Whiting; thence south to north line of lands of D. C. Williams, being now about one-fourth of a mile from the first line given herein; thence meandering gracefully southwesterly to the Pacific Ocean, and thence on the seashore to the place of beginning.   It will be noticed that some-one discovered that extreme tight lacing about the middle was about to prove fatal to the scheme, so the narrow connection along the Valley road is left for an example to the school children of an isthmus or a strait—but not of straight dealing.   Will any person, kindly tracing this thing out on the map, let us know if in his opinion anybody not belonging to the species of animals from which we make pork will call it fair play or straight dealing or common decency.

"Now the boss down there in Summerland, Ed. Stevens, who owns the pool and card room on the corner, is in the background pulling wires to carry an election to vote bonds on us to help him build a school house—or something.   If the people of Summerland love him and his pool room, we do not object.   Let them have him.   But why should we be called on to support him?   We are not complaining of the extra taxation itself.   But we do not belong to Summerland. We were unjustly taken from Ortega district without our knowledge.   In order to reach Summerland, we pass immediately by the Ortega schoolhouse, down to the Coast highway and over the Ortega hill, two miles beyond the Ortega school. Or we may pass through Ocean district, immediately by the schoolhouse, and go two miles further to Summerland.   There are no other than those two roads.

"We need our funds for the district in which we rightfully belong; and we therefore appeal to the people of Summerland, if they do not approve of legalized robbery not to vote their burdens upon us, but to give us a chance to undo the injustices done us in the past. After the present bond issue is defeated and we are permitted to pay our taxes into our own school funds, Summerland may tax herself to death for the benefit of her local bosses if she wants to. But please leave us out of it."

Appellants complain that the trial court erred in instructing the jury that the publication was libelous *per se,* and they invoke the rule that "it is never libelous to accuse a person of having done that which he may legally and properly do." The validity of this rule may be conceded, but in its application, the words "and properly" must not be ignored. It is not sufficient answer to a charge of libel to show that the publication only accuses the plaintiff of having done that which he may legally do. It has never been the law that a publication, to be libelous, must accuse a person of having committed a crime or otherwise violated some law. [1] Libel, in this state, includes a publication "which exposes any person to hatred, contempt, ridicule or obloquy . . . " (if false and unprivileged), irrespective of whether or not it charges a violation of law. "This definition is very broad, and includes almost any language which, upon its face, has a natural tendency to injure a man's reputation, either generally or with respect to his occupation." (*Schomberg* v. *Walker,* 132 Cal. 224, 227 [64 Pac. 290].) If the publication above quoted, disregarding the attempted enlargement thereof by innuendo, is libelous at all, it is libelous *per se.* "Where there is a statutory definition . . . language which is fairly included in such definition is libelous *per se.*" (Id.) Considering the publication herein, "as well from the expressions used, as from the whole scope and apparent object of the writer" (*Cooper* v. *Greeley,* 1 Denio (N. Y.), 358), it in effect charges the plaintiff with procuring by crooked methods an unjust change in the boundaries of a school district and with being actuated by bad faith in so doing. So regarded, it cannot be doubted that the natural tendency thereof would be to expose the plaintiff to obloquy, which is the equivalent of censure, reproach, blame, or reprehension.

(*Bettner* v. *Holt*, 70 Cal. 270 [11 Pac. 713]; *Tonini* v. *Cevasco*, 114 Cal. 273 [46 Pac. 103].)

Appellants urge that conceding that some of the language used, if taken alone, would be libelous, nevertheless, when read in the light of the context its defamatory character disappears and it becomes apparent that the plaintiff is accused therein of only doing that which every citizen has a right to do under the law. They invoke the rule illustrated by the *dictum* that "If a man be called a murderer, but it appears that the epithet was so applied to him because he unlawfully hunted on another man's premises and killed several hares, there is no slander." They point out that the change of school district boundaries here referred to could only be made by action of the board of supervisors upon a proper petition therefor signed by the requisite number of heads of families, and that in acting upon such petition the supervisors have the authority under the law to change the boundaries therein proposed, as they actually did in this case upon the recommendation of the superintendent of schools. They point out that every citizen is accorded by law the right to prepare, circulate, file, and urge the adoption of such a petition and that all men are presumed to know the law. They submit that when the publication herein is read in the light of these circumstances, it becomes apparent that it charges plaintiff only with doing that which he had a right to do under the law; that it should have been so understood by the readers; and that it is therefore not libelous. In the application of this rule, the publication should be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law and in the application of the rules of pleading, as by the question, "What would be its natural and probable effect upon the mind of the average lay reader of the newspaper?" We have no doubt that the latter would understand therefrom that the plaintiff was accused of bad faith and crooked dealing. But even when carefully analyzed we find nothing in the article which destroys or negatives its defamatory imputations. Giving full effect to all of the rules of law invoked by appellants, the fact still remains that the plaintiff could have corruptly changed the description in the petition after the same was signed, and that he could have procured the action of the supervisors by corrupt methods or by "crooked"

practices. There is nothing in the article which negatives either of these inferences. On the contrary the statement that, "However, when we learn that E. P. Stevens . . . worked the thing up and got it done we do not so much blame the public officers who are involved in it," clearly implies that he succeeded in imposing upon the supervisors by some means. Each one of appellants' claims in this connection was urged upon this court with much force and with equal reason in behalf of appellants in *Earl* v. *Times-Mirror Co.*, 185 Cal. 165, 192 [196 Pac. 57], and there rejected. **[2]** We conclude that the trial court correctly instructed the jury that the publication was libelous *per se.*

The contention that the court erred in instructing the jurors that the publication was unprivileged is without merit because the defendants did not plead privilege. That instruction told the jurors, in effect, that the question of privilege was not an issue in the case, and it was not. **[3]** In this state the defense of privilege, like that of justification, must be specially pleaded or it cannot be availed of. (*Gilman* v. *McClatchy,* 111 Cal. 606, 611 [44 Pac. 241]; *Swan* v. *Thompson,* 124 Cal. 193, 200 [56 Pac. 878]; *Gosewisch* v. *Doran,* 161 Cal. 511, 516 [Ann. Cas. 1913D, 442, 119 Pac. 656]; *Riley* v. *Evening Post Pub. Co.,* 30 Cal. App. 294 [158 Pac. 225].) The *dictum* to the contrary in *Schomberg* v. *Walker, supra* (p. 229), was *obiter,* for the reason that the defense of privilege was pleaded in that case. It is out of line with the settled course of decisions in this state and is not to be followed. It is true that under the early common law the defense of privilege was available under the general issue, but that is no longer the law of England, and has never been the law of this state. **[4]** This defense is essentially one of confession and avoidance and this is further evidenced by the circumstance that under it the burden of proving the absence of actual malice rests upon the defendant. (*Snively* v. *Record Publishing Co.,* 185 Cal. 565 [198 Pac. 1, 6]; *Longsworth* v. *Curson,* 56 Cal. App. 489 [206 Pac. 779].) **[5]** The rule that privilege to be available as a defense must be pleaded is subject to the single exception that when it appears upon the face of the complaint it may be availed of by demurrer. (*Gosewisch* v. *Doran, supra; Riley* v. *Evening Post Pub. Co., supra.*) But this exception is limited to cases of absolute privilege under subdi-

visions 1 and 2 of section 47 of the Civil Code, and manifestly this must be so, because of the fact that in cases of qualified privilege the burden is upon the defendant to prove the absence of malice. The only privilege which could possibly be claimed herein is a qualified privilege and the defendants, having failed to tender this issue by their answer, cannot be heard to say that it should have been submitted to the jury.

We come now to a serious claim of error, the validity of which must be conceded. The plaintiff, upon the witness-stand, was asked by his counsel the following question: "I will ask you what effect if any, it [the publication complained of] had on your wife, so far as you were able to observe—not from what she told you but from what you observed yourself?" This was objected to "as irrelevant, immaterial and incompetent, as the feelings of the plaintiff's wife are not subject for damages in this action." The objection was overruled and plaintiff answered: "I know it made her feel bad. She cried about it and did not want to live in a community where we were called hogs and pigs; insisted that I sell the home and get out of there. I know that she was sick for two or three days afterwards—worried over it, and did not sleep." That the admission of this testimony was erroneous cannot be seriously doubted. Respondent makes a half-hearted effort to justify it under the rule in *Cahill* v. *Murphy*, 94 Cal. 29 [28 Am. St. Rep. 88, 30 Pac. 195], and cases there cited, wherein it was held proper to show of what members the plaintiff's family consisted, "and the damages consequently enhanced by the fact that the members of the plaintiff's family would suffer by reason of the disgrace visited upon [plaintiff] by the slanderous charge." But that rule has never been extended so as to render admissible evidence to prove that members of plaintiff's family actually did suffer in consequence of the publication. To do so would be to import into the case collateral issues upon which no logical limitations could be placed. Another vice inherent in the ruling is that it would serve to make an element of defendants' liability depend upon, not what would be the natural and probable effect of the wrong done by them, but upon what was its actual effect upon the particular mentality, temperament, and nervous constitution of an individual who was a stranger

191 Cal.—5

to the action. The case of *Dennison* v. *Daily News Publishing Co.*, 82 Neb. 675 [23 L. R. A. (N. S.) 362, 118 N. W. 568], is on all-fours with the instant case on this point, and it was there held that the admission of testimony of the precise character here under consideration was prejudicially erroneous.

In *Earl* v. *Times-Mirror Co.*, *supra* (see 185 Cal. 170–172 [196 Pac. 60]), the plaintiff was himself a newspaper publisher and the claim of the defense was that the libel complained of was but a circumstance which "occurred in a prolonged newspaper controversy which nobody took very seriously, not even the newspapers themselves." Under these circumstances the plaintiff was permitted to testify that he did take the matter seriously, that he suffered greatly in consequence thereof, and that he believed that his wife also suffered likewise. In that case the trial court "was careful to instruct the jury that they were *not* to consider the plaintiff's testimony as evidence of the fact that the wife was affected by the article." In the instant case the trial court instructed the jury, in effect, that they were to consider that testimony as evidence of such fact. This court held in the Earl case that under the peculiar circumstances of that case there was no error in admitting the testimony there received, but in doing so it was careful to point out that "such testimony is not received to establish the actual effect upon the community or upon the members of his family, but to prove the effect upon himself." This court also took pains to point out that the plaintiff there "did not testify to the effect of the article upon his wife, or of her grief, if any, upon him." The rule of the Dennison case (*supra*) was there considered and its validity, in effect, conceded. In short, the court there indicated, unmistakably, that the admission of such testimony as was here admitted would have been prejudicially erroneous. (See, also, *Smith* v. *Atchison etc. Ry. Co.*, 179 Cal. 611, 615 [178 Pac. 501].)

The trial court, at the request of the plaintiff, instructed the jury that "you may take into consideration as an element of damage the mental suffering on the part of plaintiff, if any, growing out of the fact, if you find it to be a fact, that he was conscious that members of his family suffered by reason of the statements contained in the publication

herein complained of.'' This instruction adopted the theory which in the Earl case was said to be ''untenable.'' It emphasized and magnified the error in the admission of the testimony; as that was the only testimony in the case to which this instruction could have referred. It also, in effect, suggested to the jurors that they could base a finding of fact upon this testimony of conclusions which were incompetent, even if the subject matter thereof had been otherwise admissible.

[6] The admission of that testimony and the giving of this instruction were erroneous, and it remains only to consider whether these errors require a reversal of the judgment. Respondent calls attention to article VI, section 4½, of the constitution and suggests that they do not. The amount of the verdict was $5,000. Appellants make no claim that this was excessive, in the sense that it was so grossly disproportionate to the damages proved as to at once suggest the influence of prejudice or passion or improper motives. But it was sufficiently large, when considered in the light of the evidence produced, to give support to appellants' claim that it is attributable in part to the consideration by the jury of the evidence of the actual suffering of plaintiff's wife. There was no evidence as to the plaintiff's status in life, or as to the nature, or extent of his business, social, or political acquaintance or associations. There was no evidence of the extent of the circulation of the newspaper in which the publication was made, and no evidence that it had any circulation at all in the community in which the plaintiff and defendants resided. There was no evidence and no claim that the plaintiff suffered any injury in respect to his business or occupation. The compensatory damages were thus limited to the injury to his reputation and his mental suffering, and the evidence as to the former was most meager. We are thus impelled to the conclusion that a very substantial portion of the award was based upon a consideration by the jury of the evidence which was improperly admitted and then unduly emphasized and called to the particular attention of the jury by the court's instruction, which referred to the mental suffering of the plaintiff's wife. To the extent to which the verdict was based thereon, it resulted in a miscarriage of justice.

We do not overlook the fact that under the pleadings and the evidence a portion of the amount awarded by the verdict may be attributed to punitive damages. But no evidence was produced of the wealth of either of the defendants which would justify the imposition of a very heavy penalty by way of punishment or example, and the verdict is still sufficiently large, in the light of the evidence, to suggest that it must have been based in part upon the evidence erroneously admitted. It is therefore our duty to reverse the judgment and remand the case for retrial. It may be that the respondent, rather than suffer the expense and delay incident to a retrial of the action, would prefer to consent to a very liberal reduction of the judgment. We are not disposed nor have we any criterion by which to determine what portion of the verdict is attributable to the errors in the admission of the evidence and the giving of the instruction. But if the respondent should be willing to consent that the amount awarded him by the verdict should be reduced by one-half, it could not then be said that in the judgment as so modified there is any miscarriage of justice.

The judgment is therefore reversed, unless the plaintiff shall, within thirty days after the filing of the *remittitur* in the superior court, file with the clerk and give to the defendants a stipulation remitting from the judgment the sum of two thousand five hundred dollars. If such stipulation be so filed and delivered, the superior court is directed to amend the judgment in conformity therewith, and thereupon the judgment shall stand affirmed. Appellants to recover their costs of appeal.

Wilbur, C. J., Lennon, J., Kerrigan, J., Lawlor, J., Seawell, J., and Waste, J., concurred.