[Civ. No. 47380. Second Dist., Div. Three. Nov. 23, 1976.]

ZINA ZHADAN, Plaintiff and Appellant, v.
DOWNTOWN L.A. MOTORS, Defendant and Appellant.

## COUNSEL

David R. Glickman and Ronald Rutiz for Plaintiff and Appellant.

Hertzberg, Kaplan & Koslow and Joshua Kaplan for Defendant and Appellant.

## OPINION

POTTER, J.—In this case there are cross-appeals. Plaintiff Zina Zhadan has appealed from the order of the trial court granting a new trial upon the ground of excessive damages; defendant Downtown L.A. Motors has appealed from the judgment entered upon the jury verdict in plaintiff's favor.

The "Complaint for Damages (Conversion)" sought compensatory and punitive damages on account of defendant's seizure and retention of plaintiff's 1967 Mercedes automobile after she had authorized defendant to tow the car to defendant's place of business for the purpose of examining it to ascertain what, if any, repairs might be required and to obtain an estimate. According to the complaint as filed, defendant

purported to perform certain repair work upon said automobile without complying with the provisions of California Business and Professions Code section 9884.9,[1] and without authority or consent from plaintiff; defendant presented plaintiff with a bill in the amount of $1,952.52 for such repair work, some of which repairs were not necessary, were not done, or were done improperly; when plaintiff did not pay defendant withheld the car from her, and when she obtained possession defendant repossessed the vehicle and converted and disposed of the same to its own use. Plaintiff sought compensatory damages in the amount of $3,800, the alleged value of the car, with interest from June 19, 1973, the cost of rental of an alternative automobile, and $50,000[2] punitive damages based upon defendant's alleged malicious and oppressive conduct.

Defendant cross-complained for the value of goods and services rendered and for damages for interference with its garageman's lien based upon plaintiff's temporary taking of possession from defendant. The cross-complaint sought punitive damages of $50,000 on the claim for interference.

Evidence offered in behalf of plaintiff supported her version of the facts as follows: Plaintiff was an unmarried female, age 26, at the time of the events giving rise to this action. She had purchased a 1967 Mercedes 230 SL from a private party in late 1971. She paid $3,600 and financed the car through a bank loan.

On three prior occasions plaintiff had the vehicle serviced in defendant's service department. On each occasion she was presented with a written estimate in advance which she signed before any work was undertaken. Plaintiff's place of employment was a few blocks from defendant's place of business.

---

[1]Business and Professions Code, section 9884.9, provides in part: "(a) The automotive repair dealer shall give to the customer a written estimated price for labor and parts necessary for a specific job. No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer. No charge shall be made for work done or parts supplied in excess of the estimated price without the oral or written consent of the customer which shall be obtained at some time after it is determined that the estimated price is insufficient and before the work not estimated is done or the parts not estimated are supplied."

During the trial, the complaint was amended by interlineation to include reference to Business and Professions Code sections 9884.8 and 9884.10.

[2]The original prayer for punitive damages was $50,000. Plaintiff was, however, permitted to amend in the course of the trial to increase the prayer to $500,000.

Plaintiff drove the car to work on Saturday, May 12, 1973, and parked it on the street. It operated normally on the trip downtown from Santa Monica where she lived. Plaintiff was preparing to leave Los Angeles to go to New York on business that afternoon; when she attempted to start the car, turning the ignition key merely produced a click. Thinking that the problem was a dead battery, plaintiff had the car pushed across the street to a closed gasoline station and it was left in the area of the pumps. She locked the car, left the keys with a girl friend, and departed for New York.

On Monday, May 14, 1973, plaintiff called from New York and spoke to defendant's service manager, Jim Bodhaine. In the first call, Bodhaine advised that the keys had been brought in but that the car had not yet been picked up so plaintiff should call again in an hour. In a second call an hour later, Bodhaine advised that the car still had not arrived at the service department. Plaintiff asked Bodhaine to expedite picking up the car since it would interfere with the gas station's operation, and told him that the car would not start due to failure of the engine to turn over. She asked that Bodhaine give her an estimate. Plaintiff's third call produced Bodhaine's report that the car had been picked up but it still was not known what was wrong with it and that plaintiff should call back again. Plaintiff made a fourth call in which Bodhaine advised that he still didn't "have any answers." Plaintiff, by this time, was being criticized by her employer for taking so much time from her duties and she so advised Bodhaine and told him not to do anything with the car until she returned. Bodhaine did not give her any diagnosis of the problem with the car, nor did he state any estimated price for repairing it.

When plaintiff returned to Los Angeles around the first of June, she went to defendant's service department and spoke to Bodhaine. He directed her to a clerk who gave her an invoice to which were attached nine parts lists and which showed a total amount due of $1,957.22. The copy of the invoice given plaintiff was received in evidence; it had no entry in the blanks "original estimate" and "authorized addition" and bore no signature in the place provided for the owner's authorization. The description of the work comprised two items. The first was "Tow-in (won't run)." The second item was "Engine job replace short block grind valves." There was no breakdown of the total labor charge of $630. Plaintiff expressed shock over being billed when she had never authorized any work and commenced to cry. She was referred by the clerk back to Bodhaine who stated that the invoice showed the work done "and that was it." When plaintiff asked how she was supposed to pay, Bodhaine

directed her to the credit manager. Still crying, plaintiff went to the credit manager who simply handed her an application to fill out. Plaintiff asked where her car was and learned that it was in defendant's lot across the street.

Believing that she had been cheated and had never authorized any work for her car, and wanting to have a mechanic check to see if any work in fact had been done, plaintiff, who had a separate set of keys, drove the car from the defendant's lot to her place of work a few blocks away, and from there to Santa Monica at the end of her work day. On the way to Santa Monica the car ran hot and when stopped emitted coolant, smoke and steam. Plaintiff took the car to a garage in Santa Monica which specialized in Mercedes automobile repair. Plaintiff arranged to have the overheating problem corrected and the engine condition checked. She was advised by the mechanic that in several respects the repair work done by the defendant had been improperly carried out. She paid a total of $87 for the corrective work and when it was completed the car ran "O.K."

Plaintiff took the car home and parked it, locked, in the garage at her apartment. The following morning plaintiff found that her car had been taken. She later ascertained that it was repossessed by defendant. Plaintiff refused to pay defendant's bill and the car remained in defendant's possession.

In order to provide transportation, plaintiff rented cars for a time, for a total cost of approximately $1,000,[3] and then leased a Datsun on a two-year lease for $121.90 a month. Plaintiff was still leasing the Datsun at the time of trial.

As a result of plaintiff being obliged to continue payments of $68 per month due the bank on the loan secured by the Mercedes, and at the same time paying rental for an alternate vehicle, plaintiff found it necessary to take an extra job and to seek a less expensive apartment. When her employer found that she was holding down two jobs, she was fired and had to beg to get her job back.

Anthony Adams, the mechanic who examined the car after defendant's purported repair, testified that, in his opinion, the work for which

---

[3]The precise amount that plaintiff paid for car rental is impossible to ascertain from the record; it was either $1,053 or some slightly lesser sum.

plaintiff had been charged was not satisfactorily done: (1) he compared the compression in each of the six cylinders and found variations up to 20 percent, which were inconsistent with the valves having been ground; (2) he found that a cooling system reserve tank return line was recently welded shut, depriving the engine of the designed coolant reserve; (3) there was no thermostat, which was a required element of the cooling system; (4) the wrong heat range spark plug had been installed, creating a hazard of overheating and engine damage; (5) the distributor was not properly tightened; and (6) the air filter was old and dirty. It was Adams' expert opinion that the valves had not been ground.

Mr. Nicholas Shammas was called by plaintiff as a witness under section 776 of the Evidence Code. He testified that he was owner of all of the stock of defendant corporation. Over defendant's objection that it was irrelevant, Shammas testified that he was also owner of all of the stock of three other dealerships in downtown Los Angeles.

Shammas testified that the defendant is licensed by the Consumer Affairs Bureau of the State of California, that compliance with the state laws and regulations was a matter of constant consideration and attention, and that it was the policy of the defendant that no work be done on a customer's car without authorization. Normally, a customer was asked to sign the estimate authorizing the repairs. This, however, was not done where the customer called in to discuss the matter, when it was not practicable. The following questions and answers related to this practice:

"Q. Normally the customer would sign where it says 'I hereby authorize the repairs'?

"A. Unless they call in, yes.

"Q. And was it your practice to direct your service personnel to always at least give the customer an original estimated price?

"A. Obviously that can't be done if they are not there.

"Q. Not even to tell them the estimated price on the telephone?

"A. When you talk on the phone and you get confirmation on the phone, which we do every single day, we couldn't operate a single day if we had to run out to Belvedere Gardens or wherever it might be, in

Venice or wherever it might be, and get their signature because, of course, most people we do business with frequently and we know them and we get confirmation.

"Q. My question is, don't you at least tell your service people to at a minimum put something down on the invoice, at least the original estimated price for a record?

"A. When you get a telephone confirmation to do additional work, usually—usually when they pick up the car, they sign everything, and you get everything cleared, you know, and they pay you and you get everything cleared at that time. So very often conversation will be carried on on the phone and quite frequently and almost on a daily basis. We couldn't operate any other way."

Further questions and answers in this respect were:

"Q. Do you instruct your service employees to give each customer a written estimated price for labor and parts on a specific job before doing the job?

"A. Not when—obviously when they call on the phone you couldn't.

"Q. You could mail it to them?

"A. For what purpose?

"Q. Comply with the law.

"A. That is not the word of the law.

"Q. Well, we will see.

"MR. WIEZOREK [Counsel for Defendant]: Objection, Your Honor, as argumentative at this point.

"THE WITNESS: Well, let me correct that. The understanding we have with all of the authorities, including the Consumer Affairs, is that you can negotiate business on the telephone."

Plaintiff offered in evidence financial statements of defendant showing total net worth as of December 31, 1973, of $438,588.85, and total net worth as of June 30, 1975, of $531,668.26.

Defendant's service manager, Mr. Bodhaine, was a witness in behalf of defendant. He testified that during the conversations with plaintiff on May 14, 1973, he advised her that a compression check had been made upon the engine of her car which revealed that it had blown a head gasket and most likely had burned valves. The estimated cost of replacing the head gasket and replacing the valves was $300 to $500. Plaintiff orally approved this estimate. It was based on the assumption that there was no further damage such as cylinder wall damage. According to Bodhaine, when the engine was disassembled, it was found that in addition to a blown head gasket and burned valves, there was severe cylinder wall damage. Plaintiff had stated that she would call again on Tuesday, May 15, so the work was stopped, awaiting her call. Plaintiff called on the 15th and was given the bad news. Bodhaine recommended a new short block at an estimated total cost of about $2,000. According to Bodhaine, plaintiff approved this work and Bodhaine made a notation on the work sheet copy of the invoice. In the space headed "Authorized Addition," he made the entry "$1500.00," and in the space marked "Authorized By," he entered "Phone Owner 10:10 5/15/73." This correlated with another shop copy showing an original estimate of $300 to $500.

Augusto Cespedes, defendant's service manager at the time of the trial, testified that in his opinion all of the repair work done by defendant upon plaintiff's automobile was both necessary and properly performed. It was, however, conceded by Bodhaine that such a car with its valves recently ground should have a variation not to exceed 5 percent in the compression in the various cylinders.

The evidence with respect to the value of plaintiff's car was limited to the testimony of Thomas Iannone, defendant's sales manager, who stated that, based upon the assumption that the automobile "had to have a short block put into it," its retail value was between $1,200 and $1,700. However, in good condition, the car was worth $3,500 to $4,000.

Mr. Iannone also testified that he had a discussion with plaintiff about financing a new automobile and the trade-in value of plaintiff's car, in the course of which plaintiff made reference to the repairs having been done by defendant but did not claim they were unauthorized. Iannone

further testified that plaintiff appeared to be very calm at this time. Plaintiff denied any such conversation.

Darris Sloan, employed by defendant as a general service manager, also described a conversation with plaintiff in which she discussed financing the repair bill. Sloan put her in touch with a Dial Finance Office where she talked to a Mr. Buchanan and reported that the finance company would require time to check out her credit. According to Sloan, plaintiff seemed calm and did not complain about any unauthorized repairs.

The jury returned a verdict in favor of plaintiff and against defendant for general damages in the sum of $5,342, and punitive damages in the sum of $175,000. Defendant made a motion for a new trial, specifying all the statutory grounds. The court granted defendant's motion for a new trial conditionally "upon the ground of excessive damages for the reason the damages appeared to have been given by the jury under the influence of passion or prejudice." No separate statement of reasons was signed or filed by the court within the 10-day period specified by section 657 of the Code of Civil Procedure. The order granting a new trial was subject to the condition "that the motion for a new trial is denied if the plaintiff consents to a reduction of the punitive damages to the sum of $50,000." Plaintiff did not so consent, and the court thereafter made its minute order noting such fact. Plaintiff timely filed her notice of appeal from the order granting a new trial, and defendant thereafter filed a notice of cross-appeal from the judgment. Both appeals lie.

## Contentions

Plaintiff contends on her appeal from the order granting a new trial that the order must be reversed due to the court's failure to make an adequate statement of reasons for the court's conclusion that the punitive damages awarded were excessive. Defendant does not contest plaintiff's claim of inadequacy of the reasons stated but contends that plaintiff's failure to seek mandamus to require the court to adequately state its reasons estops her from attacking the sufficiency of the order. Plaintiff, in turn, contends that she was under no obligation to seek such relief.

On the cross-appeal from the judgment, defendant contends (1) that both the compensatory and punitive damage awards were excessive and were the result of the passion and prejudice of the jury, (2) that the court erroneously denied defendant's requested jury instruction on exemplary

damages, and (3) that the application of California Civil Code section 3294 by the jury instructions was unconstitutional.[4]

### Plaintiff's Appeal

■ The order granting a new trial failed to make an adequate specification of reasons. Plaintiff was under no obligation to seek a mandate to require the court to state such reasons. The order must, therefore, be set aside and the judgment reinstated.

### The Statements of Reasons Is Totally Inadequate

It is necessary to refer only to the decision of our Supreme Court in *Stevens* v. *Parke, Davis & Co.,* 9 Cal.3d 51 [107 Cal.Rptr. 45, 507 P.2d 653], to demonstrate the insufficiency of the court's specifications of reasons. In that case, a virtually identical order was made as follows (9 Cal.3d at p. 59, fn. 9): " ' 'On the issue of excessiveness of the verdict, the Court finds that the verdict is excessive, that it is not sustained by the evidence, and that it is based upon prejudice and passion on the part of the jury. It is therefore ordered that a new trial be granted, on the issue of damages only, unless the plaintiffs consent to a remission of the verdict to the sum of $60,000.00 general damages plus $4,673.42 special damages . . . .' "

In holding this was not an adequate statement, the court stated (9 Cal.3d at p. 62): "In applying these rules to the instant case, we note that the new trial order makes no pretense of specifying reasons upon which the judge based his decision to grant defendants' motions. The statement that the 'verdict is excessive, that it is not sustained by the evidence' is, as in *Scala* and *Mercer,* a statement of ultimate fact that does not go beyond a statement of the ground for the court's decision. It does not indicate the respects in which the evidence dictated a less sizable verdict, and fails even to hint at any portion of the record that would tend to support the judge's ruling. Certainly the statement that the amount of the verdict was 'based upon prejudice and passion on the part of the jury' is not a 'reason' that provides an insight into the record."

Defendant does not offer any contrary authorities on this question. We, therefore, conclude that the order does not comply with the requirements of Code of Civil Procedure section 657.

---

[4]Additional contentions of defendant concerning the admissibility of evidence and the propriety of permitting plaintiff to amend the complaint midtrial will not be discussed in view of the disposition favorable to defendant.

494

### ■ There Is No Requirement That the Party Against Whom a Motion for New Trial Is Granted Without Adequate Statement of Reasons Seek Mandamus to Require an Adequate Statement

Defendant's contention that plaintiff was under "a duty to make a timely jurisdictional challenge to the sufficiency of the court's specification of reasons" is wholly unsupported by the authorities it cites or by any logical reason. In *LaBorne v. Mulvany*, 43 Cal.App.3d 905, 917 [119 Cal.Rptr. 596], the court indicated that the party *in whose favor such a motion was granted* with inadequate statement of reasons was free "to apply for a writ of mandate ordering the judge to specify his reasons for granting the motion within the 10-day period." In *LaBorne*, the court referred in this respect to footnote 8, at page 123, of the opinion of our Supreme Court in *Mercer v. Perez*, 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315], where the court noted that though the statute specifically prohibits the attorneys for the parties preparing the statement of reasons for the court, there would be no ground to criticize an attorney for calling the court's attention to the fact that no adequate statement of reason had been given for an order granting a new trial in his favor. Nothing said in either case suggests that the party against whom the motion is granted should take steps to cause adequate reasons to be stated (which would be contrary to his interests).

There is, moreover, no logical basis for the party against whom such a motion is granted to know that such relief is appropriate. An order of the type here made does not foreclose the possibility that the court will later file a separate adequate statement of reasons. Until the 10 days during which the court's power to act has come to an end, it is impossible to know that such a separate statement is not forthcoming.

Accordingly, we find no duty on the part of appellant to seek extraordinary relief. The order granting a new trial must, therefore, be reversed.

### Defendant's Appeal

### ■ The Punitive Damage Award Is So Excessive as to Indicate That It Is a Product of the Jury's Passion and Prejudice

Defendant attacks the jury's award of $5,342 compensatory damages as well as its award of $175,000 punitive damages as the product of "passion and prejudice on the part of the jury." ■ So far as the

compensatory damages are concerned, it appears that upon the evidence presented it is difficult to justify an award in that amount. There is, however, nothing indicative of passion or prejudice in the jury's making such an award. The only elements of damage alleged in the complaint are plaintiff's loss of the value of the automobile, alleged to be $3,800 as of the date of the conversion, with interest at 7 percent per annum from June 19, 1973, and the alleged deprivation of plaintiff's use of her automobile by reason of which she was compelled to rent another automobile. There was evidence to support plaintiff's claim of a $3,800 value for her car, on the assumption that it did not require the work which defendant allegedly performed on it. There was also evidence, received without objection, that plaintiff expended approximately $1,000 for rental automobiles and approximately $2,550 as lease rental by the time of trial.

Plaintiff also offered substantial evidence of her suffering emotional distress as a consequence of defendant's conduct which, if plaintiff's testimony was believed, was of an outrageous nature. However, plaintiff did not allege that she suffered any emotional distress and sought no amendment to so allege.

Under the circumstances, the jury's award appears excessive. The $3,800 value of the car with interest at 7 percent for two years was approximately $4,332. In argument, however, counsel for plaintiff suggested acceptance of defendant's estimate that the car was worth only $1,200 to $1,700, saying: "I will put her car at $1,500." It would appear, therefore, that what the jury probably did was award this figure with interest plus their understanding of the total rental expense incurred. Plaintiff should not, of course, have been awarded the value of her car with interest thereon and also awarded the expense incurred by her in providing an alternative vehicle. If she were awarded the value of her car with interest, the provision for alternative transportation would be her responsibility.

The amount of the compensatory award does not, therefore, appear to be supported by the evidence (in view of plaintiff's failure to allege emotional distress), but it is not in any respect indicative of passion or prejudice since the jury might well have been confused as to the duplication involved in such an award.

Our review of the punitive damage award involves different considerations. The function of the reviewing court on appeal from a judgment on

the ground of excessive damages is stated by our Supreme Court in *Finney* v. *Lockhart,* 35 Cal.2d 161, 164 [217 P.2d 19], where the court said: "The reviewing court's power to declare an award of damages excessive exists only when from the facts the amount appears at first blush to suggest passion or prejudice on the part of the jury. There is no distinction when the review is of an award of exemplary rather than actual damages. (*Varcoe* v. *Lee,* 180 Cal. 338, 341 [181 P. 223]; *Scott* v. *Times-Mirror Co.,* 181 Cal. 345, 366-367 [184 P. 672, 12 A.L.R. 1007]; *Livesey* v. *Stock,* 208 Cal. 315, 322 [281 P. 70]; 15 Am.Jur. p. 738, § 297.) These and other cases indicate that it is the province of the jury, and the trial court on the motion for a new trial, to say whether punitive damages should be awarded. The presumptions are in favor of the correctness of the verdict and judgment. After an award has been approved by the trial court the reviewing court will hesitate to declare the amount excessive unless upon consideration of the entire record including the evidence it must be said that the award was the result of passion or prejudice. (See *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 801 [197 P.2d 713]; *Pickwick Stages* v. *Board of Trustees,* 54 Cal.App. 730 [215 P. 588]; *Singleton* v. *Singleton,* 68 Cal.App.2d 681, 704 [157 P.2d 886].)"

In this case, of course, the award has not been approved by the trial court, though, by reason of its failure to make an adequate statement of reasons, the order granting a new trial cannot stand. Nonetheless, we have no power to weigh the evidence and judge the credibility of witnesses. ■ We are, however, charged with the responsibility to act if it appears that " 'the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejuice . . .' " (*Cunningham* v. *Simpson,* 1 Cal.3d 301, 308 [81 Cal.Rptr. 855, 461 P.2d 39].)

■ Also pertinent to our consideration is the rule that "an award of punitive damages must bear a reasonable relationship to actual damage . . ." (*Schroeder* v. *Auto Driveaway Co.,* 11 Cal.3d 908, 922 [114 Cal.Rptr. 622, 523 P.2d 662]; see also *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 802 [197 P.2d 713].) Likewise applicable is the principle that, the purpose of punitive damages being to punish the defendant and make an example of him, "the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective" (*Bertero* v. *National General Corp.,* 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]), from which it "also follows that the poorer the wrongdoing defendant the smaller the award of punitive damages need be in order to accomplish the statutory

objective" (*Merlo* v. *Standard Life & Acc. Ins. Co.,* 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416]). Finally, due consideration must be given to the importance of the public policy embodied in the statutory provisions the violation of which was the basis of plaintiff's claim, and the magnitude of defendant's violation of such policy. (*Wetherbee* v. *United Ins. Co. of America,* 18 Cal.App.3d 266, 270-271 [95 Cal.Rptr. 678]; *Weisenburg* v. *Molina,* 58 Cal.App.3d 478, 490 [129 Cal.Rptr. 813].)

■ The evidence in this case supported plaintiff's charge of a serious violation of the policy of the Business and Professions Code provisions designed to protect consumers against unscrupulous automotive repair dealers. The jury was entitled to believe plaintiff's testimony which was to the effect that unauthorized repairs were performed on her vehicle for which defendant sought to charge over $1,950 upon a vehicle which, according to defendant's expert, had a value not to exceed $1,700. Further the jury was entitled to believe plaintiff's evidence that a substantial portion of the work was never performed. The jury was, therefore, entitled to consider defendant's conduct a flagrant violation of the provisions of Business and Professions Code section 9884.9, which provides in pertinent part: "No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer."

■ As our Supreme Court stated in *Vasquez* v. *Superior Court,* 4 Cal.3d 800, 808 [94 Cal.Rptr. 796, 484 P.2d 964]: "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." The provisions of section 9884.9 are, of course, designed to achieve such protection. We must, therefore, consider any violation of its provisions as a serious violation of the public policy of this state.

■ The evidence thus fully supported the imposition of punitive damages in a very substantial amount. This is confirmed by the trial court's order conditioning the granting of a new trial upon plaintiff's rejection of a reduction in the punitive damages to $50,000. It is unfortunate that the trial judge did not make an adequate statement of reasons in support of that order. Had it done so, the reasons stated might well have shown that the new trial order was not an abuse of discretion.

■ Plaintiff's contention, however, that the testimony given by Mr. Shammas showed a continuing and general policy on the part of defendant to violate the provisions of the Automotive Repair Act (Bus. & Prof. Code, §§ 9880-9889.21) finds little support in the evidence. The

testimony referred to by plaintiff related solely to the impossibility of obtaining the customer's signature upon a written original estimated price, where the customer was not present and confirmation by phone was necessary. Though Shammas' testimony was nonresponsive to a large degree, it did not constitute an admission that even under those limited circumstances the customer was not told an estimated price.

The $175,000 figure adopted by the jury is in absolute terms a large penalty to impose in respect of a violation of even the important policy of the Automotive Repair Act. It must, therefore, be carefully scrutinized to see if it bears a reasonable relationship to the actual damage suffered by plaintiff and is not disproportionate in relation to the net worth of the defendant.

Though, as above noted, the compensatory damage award may be slightly in excess of that which the evidence would support, it is apparent that plaintiff made a showing of substantial damage from which the jury could quite properly have awarded in excess of $4,000. Thus, the $175,000 punitive damage award is roughly 40 times the compensatory damage. Though there are cases, relied upon by defendants, holding such a ratio too high (see *Booth* v. *Peoples Finance etc. Co.,* 124 Cal.App. 131, 145 [12 P.2d 50]; *Luke* v. *Mercantile Acceptance Corp.,* 111 Cal.App.2d 431, 438 [244 P.2d 764]), other cases (most of them more recently decided) cited by plaintiff have approved awards in which the ratio of punitive to compensatory damages was much higher than 40 to 1. As our Supreme Court stated in *Finney* v. *Lockhart, supra,* 35 Cal.2d 161, 164 [217 P.2d 19]: "[T]here is no fixed ratio by which to determine the proper proportion between the two classes of damages." In *Finney,* an award of $2,000 exemplary damages in a case in which nominal damages of $1 were awarded was affirmed.

More apposite, perhaps, is the decision of this statewide court in *Wetherbee* v. *United Ins. Co. of America, supra,* 18 Cal.App.3d 266. In that case, an award of punitive damages in the sum of $200,000 was affirmed where the compensatory damages amounted only to $1,050. In answer to defendant's contention that this was an excessive ratio, the court in *Wetherbee* said (18 Cal.App.3d at p. 271): "Defendant particularly points to the disparate ratio of the $1,050 actual damages to the $200,000 of exemplary damages in the jury award. There is no fixed ratio by which to determine a proper proportion between the two classes of damages; the factors influencing the amount of the exemplary award can only be disclosed by the trial record (*Finney* v. *Lockhart,* 35 Cal.2d 161,

164 [217 P.2d 19]). Although superficial comparisons are of little value, we note that in *Finney* v. *Lockhart, supra,* the actual damages awarded were $1, the exemplary damages, $2,000, the identical ratio here present."

What the court made clear in *Wetherbee* is that the excessiveness of a punitive damage award cannot be established by reference alone to the disparate ratio between it and the compensatory damage award. In that case of an aggravated consumer fraud committed by an insurance company, the court noted the necessity for a large punitive award in order to adequately "serve as an example or warning to others not to engage in such conduct" (18 Cal.App.3d at p. 270), and to make "the punishment fit the offense" (*id.*), in light of the great net worth and high profits of the defendant. The court pointed out in this respect (18 Cal.App.3d at p. 271): "The record indicates that according to defendant's 47th report to its stockholders, it had $300,000,000 in gross assets, $60,000,000 in net assets, and a monthly net income after taxes of $1,000,000. The $200,000 amount awarded by the jury represents less than a week's after-tax income of the defendant. The jury measured the punishment in the light of the evidence, indicating defendant's ability to respond to the award (*Coy* v. *Superior Court,* 58 Cal.2d 210 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678]) and in doing so made the example as well as the punishment fit the offense."

It is apparent, therefore, that a "reasonable relationship" between the compensatory and the punitive damages involves much more than a simple mathematical comparison between the two amounts awarded. Given a fixed amount of compensatory damages, the amount of punitive damages which will serve the purpose to punish the offense and to serve as an example to others will necessarily vary widely, the factors involved being the importance of the policy violated by defendant's conduct, the degree and extent, both qualitatively and quantitatively, of the violation, and the financial circumstances of the defendant. Where the objective of deterrence would not otherwise be served, the wealthy defendant cannot legitimately object to a ratio much higher than that involved in the case at bench.

The difficulty here, however, is that the net worth and income of the defendant was insubstantial in comparison to that of the defendant in *Wetherbee.* Rather than $60 million in net assets, the uncontradicted evidence showed merely $532,000 net assets. Instead of monthly net income after taxes of $1 million there were gross sales in that amount. It

is inconceivable that with gross sales at that level the award of $175,000 punitive damages could be "less than a week's after-tax income" which the court found reasonable in *Wetherbee.*

In *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d 5, where the same kind of insurance company imposition upon consumers was involved, a punitive damage award of $500,000 was set aside as excessive. The court said (59 Cal.App.3d at p. 18): "Moreover, we agree that the punitive damage award was excessive as a matter of law. The primary purpose of punitive damages is to punish the defendant and make an example of him. (Civ. Code, § 3294; see *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 65.) 'It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective.' (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 65 and cases there cited.) It also follows that the poorer the wrongdoing defendant the smaller the award of punitive damages need be in order to accomplish the statutory objective. Here, the uncontradicted evidence discloses that Standard's net worth was $1,607,721.01. Thus, the award of a half million dollars in punitive damages, disregarding the compensatory damage award, constitutes almost one-third of defendant's net worth. The punitive damage award is so greatly disproportionate to Standard's net worth that it is presumptively based upon passion or prejudice."

The punitive damages award in this case exceeds one-third of defendant's net worth. In our view, such a penalty could only be justified on the assumption that it is necessary to put defendant out of business in order to deter future conduct of a like nature. To support such an assumption, clear evidence of a continuing course of conduct involving large-scale flagrant violations would be required.

We, therefore, conclude that the punitive damage award is excessive and is based upon passion or prejudice of the jury. Our conclusion in this respect is reinforced by an examination of the testimony of Mr. Shammas in the course of which he, generally speaking, conducted himself in an arrogant and disrespectful manner toward opposing counsel. A similar circumstance was noted by our Supreme Court in *Cunningham* v. *Simpson, supra,* 1 Cal.3d at p. 310, where the court said: "The record suggests, moreover, that a motivating force for such a verdict may not have been the strength of plaintiff's case but, instead, the jury's antipathy for defendant. The trial judge, in denying defendant's motion for judgment notwithstanding the verdict, commented: '. . . I'm

sure that Mr. Simpson made a very poor impression . . . on the jury. He is arrogant in his manner, and his whole attitude and demeanor was such as to lend credence to the fact that this is the very thing he did. I'm sure that's what motivated [the jury].' Thus we believe that the motivation of the jury in granting this disproportionate award of $25,000 must have been 'passion [or] prejudice.' (*Morris* v. *Standard Oil Co.* (1922) 188 Cal. 468, 473 [205 P. 1073]; *Washer* v. *Bank of America Nat. Trust & Sav. Assn.* (1948) 87 Cal.App.2d 501, 510 [197 P.2d 202].)"

*Defendant's Proposed Instruction on*
*Punitive Damages Was Properly Rejected*

 Defendant proposed and the court rejected an instruction as follows: "If any punitive or exemplary damages are awarded, said damages must bear a reasonable proportion to the damage actually sustained." This statement, based upon *Booth* v. *Peoples Finance etc. Co., supra,* 124 Cal.App. 131, from which it is for the most part quoted, is not a correct statement of the law. As above pointed out, the correct rule is that the punitive damages "must bear a reasonable relationship to actual damages." (*Schroeder* v. *Auto Driveaway Co., supra,* 11 Cal.3d at p. 922.) The proposed instruction erroneously suggests that there is a fixed ratio between the punitive damages and the actual damages sustained, regardless of the impact of the other elements which bear upon the matter, including the magnitude and flagrancy of the offense, the importance of the policy violated, and the wealth of the defendant. If any instruction in addition to BAJI No. 14.71, given by the court, was appropriate, it should have explained the bearing of all these factors upon the determination.

*The Application of Civil Code Section*
*3294 to Defendant Was Not Unconstitutional*

Defendant attacks the application of Civil Code section 3294[5] because of its lack of a "precise standard by which to fix the quantum of property of which cross-appellant was to be deprived by way of exemplary damages other than solely the admonition that the jury's discretion be exercised without passion or prejudice." Defendant also claims that the punitive award herein made constituted "a 'cruel and/or unusual' punishment." Both of these contentions have been rejected by the courts of this state.

---

[5]Civil Code section 3294 provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

The most recent expression on the subject is in the decision of our Supreme Court in *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 66, fn. 13, where the earlier decisions of the Court of Appeal are cited: "Citing several cases from the criminal law, National and Klein also argue that Civil Code section 3294, enacted in 1872, is unconstitutionally vague because it fails to provide sufficient guidance for the trial courts charged with implementing it. They ignore the common law of punitive damages which section 3294 merely codifies. This body of law specifically defines when exemplary damages may be awarded and how the amount shall be determined. (*Cunningham* v. *Simpson, supra,* 1 Cal.3d 301; Annot. (1954) 35 A.L.R.2d 308.) National and Klein acknowledge this very point earlier in their brief by their insistence on modifying the damages judgment on the authority of established common law principles. We note in passing that on several occasions section 3294 has been held constitutional. (*Wetherbee* v. *United Ins. Co. of America, supra,* 18 Cal.App.3d 266, 272; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 404-405; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 716-717 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].)"

*Disposition*

The order granting a new trial must, for the reasons above stated, be reversed and the judgment reinstated. Having reinstated the judgment, we must take action appropriate to our determination that the punitive damage award is excessive and appears to be the product of the jury's passion or prejudice. Under such circumstances, the options open to us are stated in the opinion of our Supreme Court in *Cunningham* v. *Simpson, supra,* 1 Cal.3d at p. 310: "Having concluded that the jury verdict is excessive, this court may (1) remand for a new trial on all issues (see, e.g., *Rhodes* v. *Naglee,* 66 Cal. 677, 681 [6 P. 863]) or on the issue of damages alone (*Pretzer* v. *California Transit Co.* (1930) 211 Cal. 202, 209 [294 P. 382]), or (2) issue a remittitur conditioning affirmance of the judgment on plaintiff's agreement to remit part of the award (see, e.g., *Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 120-121 [130 P.2d 389]; *Stevens* v. *Snow* (1923) 191 Cal. 58, 68 [214 P. 968].)"

Upon consideration of all the circumstances, we conclude that the proper course is to remand for a new trial on all issues. Little purpose would be served by remanding for a trial upon the issue of damages alone. There is virtually no evidence relating to the matter of liability which would not also be pertinent to the issue of damages, the most significant element of which must, in any event, be punitive. We are

reluctant to attempt an exercise of the function which the trial court performed in reducing the punitive award to $50,000. We do not have the benefit of the trial court's observation of the demeanor of witnesses nor may we otherwise weigh the evidence as he was permitted to do. Under the circumstances, it would be fairer to all concerned if a new trial were to encompass all issues.

The order granting a new trial is reversed. The judgment for plaintiff is reversed.

Each party shall bear their own costs on appeal.

Allport, Acting P. J., and Cobey, J., concurred.

A petition for a rehearing was denied December 8, 1976.