[Civ. No. 54960. Second Dist., Div. One. Dec. 31, 1979.]

ZINA ZHADAN, Plaintiff and Respondent, v.
DOWNTOWN LOS ANGELES MOTOR DISTRIBUTORS, INC.,
Defendant and Appellant.

822

824

COUNSEL

Hertzberg, Koslow & Franzen, Harrison W. Hertzberg and Don Erik Franzen for Defendant and Appellant.

David R. Glickman and Ronald G. Rutiz for Plaintiff and Respondent.

## OPINION

**HANSON, J.**—Downtown Los Angeles Motor Distributors, Inc. (erroneously sued herein as Downtown L.A. Motors and hereinafter referred to as Motors) appeals a judgment in favor of plaintiff Zina Zhadan, entered pursuant to jury verdict, in this action to recover compensatory and punitive damages for the conversion of an automobile.

### FACTS

Plaintiff sought compensatory and punitive damages for the seizure and retention by Motors of her 1967 Mercedes Benz 230 SL automobile after she failed to pay a $1,952.52 repair bill for work which she claimed she never authorized. She alleged that the defendant in the repair work failed to comply with the provisions of Business and Professions Code section 9884.9 requiring a written estimate of charges and advance authorization;[1] that some of the repairs were not necessary, were not done, or were done improperly; that defendant withheld the car from her for failure to pay; and that when she obtained possession defendant repossessed and converted the car. She claimed both actual damages and punitive damages based on defendant's malicious and oppressive conduct.

At the first trial in this litigation the jury returned a verdict against defendant Motors for $5,342 general and $175,000 punitive damages. The trial court concluded the punitive damages were excessive and ordered a new trial pursuant to defendant's motion unless plaintiff consented to a reduction of punitive damages to $50,000. Plaintiff would not consent and on appeal the court reversed (*Zhadan v. Downtown L. A. Motors* (1976) 66 Cal.App.3d 481 [136 Cal.Rptr. 132]). At the second trial in December 1977 the jury returned a verdict of $5,260 general and $90,000 punitive damages. The trial court denied defendant's motion for judgment notwithstanding the verdict and for new trial, and defendant has appealed.

---

[1]Business and Professions Code section 9884.9 provides in part: "(a) The automotive repair dealer shall give to the customer a written estimated price for labor and parts necessary for a specific job. No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer. No charge shall be made for work done or parts supplied in excess of the estimated price without the oral or written consent of the customer which shall be obtained at some time after it is determined that the estimated price is insufficient and before the work not estimated is done or the parts not estimated are supplied."

It was established at trial that Zina Zhadan was in May of 1973 the owner of a Mercedes Benz 230 SL automobile she had purchased from a private party for $3,500 in June 1972. Because there was no substantial variance in the facts introduced by plaintiff at the first and second trials, we reproduce herein with minor modifications those facts as ably summarized by this court in *Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481. The trial commenced with Ms. Zhadan's testimony.

"On three prior occasions plaintiff had the vehicle serviced in defendant's service department. On each occasion she was presented with a written estimate in advance which she signed before any work was undertaken. Plaintiff's place of employment was a few blocks from defendant's place of business.

"Plaintiff drove the car to work on Saturday, May 12, 1973, and parked it on the street. It operated normally on the trip downtown from Santa Monica where she lived. Plaintiff was preparing to leave Los Angeles to go to New York on business that afternoon; when she attempted to start the car, turning the ignition key merely produced a click. Thinking that the problem was a dead battery, plaintiff had the car pushed across the street to a closed gasoline station and it was left in the area of the pumps. She locked the car, left the keys with a girl friend, and departed for New York.

"On Monday, May 14, 1973, plaintiff called from New York and spoke to defendant's service manager, Jim Bodhaine. In the first call, Bodhaine advised that the keys had been brought in but that the car had not yet been picked up so plaintiff should call again in an hour. In a second call an hour later, Bodhaine advised that the car still had not arrived at the service department. Plaintiff asked Bodhaine to expedite picking up the car since it would interfere with the gas station's operation, and told him that the car would not start due to failure of the engine to turn over. She asked that Bodhaine give her an estimate. Plaintiff's third call produced Bodhaine's report that the car had been picked up but it still was not known what was wrong with it and that plaintiff should call back again. Plaintiff made a fourth call in which Bodhaine advised that he still didn't [know what was wrong]. Plaintiff, by this time, was being criticized by her employer for taking so much time from her duties and she so advised Bodhaine and told him not to do anything with the car until she returned. Bodhaine did not give her any diagnosis of the problem with the car, nor did he state any estimated price for repairing it.

"When plaintiff returned to Los Angeles [in] June, she went to defendant's service department and spoke to Bodhaine. He directed her to a clerk who gave her an invoice to which were attached nine parts lists and which showed a total amount due of $1,957.22. The copy of the invoice given plaintiff was received in evidence; it had no entry in the blanks 'original estimate' and 'authorized addition' and bore no signature in the place provided for the owner's authorization. The description of the work comprised two items. The first was 'Tow-in (won't run).' The second item was 'Engine job replace short block grind valves.' There was no breakdown of the total labor charge of $630. Plaintiff expressed shock over being billed when she had never authorized any work and commenced to cry. She was referred by the clerk back to Bodhaine who stated that the invoice showed the work done 'and that was it.' When plaintiff asked how she was supposed to pay, Bodhaine directed her to the credit manager. Still crying, plaintiff went to the credit manager who simply handed her an application to fill out. Plaintiff asked where her car was and learned that it was in defendant's lot across the street.

"Believing that she had been cheated and had never authorized any work for her car, and wanting to have a mechanic check to see if any work in fact had been done, plaintiff, who had a separate set of keys, drove the car from the defendant's lot to her place of work a few blocks away, and from there to Santa Monica at the end of her work day. On the way to Santa Monica the car ran hot and when stopped emitted coolant, smoke and steam. Plaintiff took the car to a garage in Santa Monica which specialized in Mercedes automobile repair. Plaintiff arranged to have the overheating problem corrected and the engine condition checked. She was advised by the mechanic that in several respects the repair work done by the defendant had been improperly carried out. She paid a total of $87 for the corrective work and when it was completed the car ran [well].

"Plaintiff took the car home and parked it, locked, in the garage at her apartment. The following morning plaintiff found that her car had been taken. She later ascertained that it was repossessed by defendant. Plaintiff refused to pay defendant's bill and the car remained in defendant's possession." (*Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481, 486-488.)

Mark Slotkin, owner of Carpet Bags of America and plaintiff's employer at the time of these events, corroborated that she went to New York with him and that while there he admonished her not to make any more phone calls concerning repairs for the Mercedes because their time was limited. Sometime after their return, in June of 1973, he said Ms. Zhadan came into his office crying and upset, carrying a sheaf of papers which represented the repair bill for the Mercedes and asked him what to do. He suggested she should get her car out of defendant's possession, take it to another garage to have it checked, and if it was not in good condition or there was a possibility of a mechanic's lien, she should sell the car.

Mr. Adams, the owner of the Bon Voyage Garage, appeared as a witness on behalf of plaintiff and testified as he had at the first trial. "Anthony Adams, the mechanic who examined the car after defendant's purported repair, testified that, in his opinion, the work for which plaintiff had been charged was not satisfactorily done: (1) he compared the compression in each of the six cylinders and found variations up to 20 percent, which were inconsistent with the valves having been ground; (2) he found that a cooling system reserve tank return line was recently welded shut, depriving the engine of the designed coolant reserve; (3) there was no thermostat, which was a required element of the cooling system; (4) the wrong heat range spark plug had been installed, creating a hazard of overheating and engine damage; (5) the distributor was not properly tightened; and (6) the air filter was old and dirty. It was Adams' expert opinion that the valves had not been ground." (*Zhadan* v. *Downtown L.A. Motors, supra,* 66 Cal.App.3d 481, 488-489.) He said, however, that the engine had a new short block. He corrected the cooling system, tightened the distributor, installed a new air filter, changed the spark plugs and adjusted the valves for Ms. Zhadan.

Nicholas Shammas, called by plaintiff pursuant to Evidence Code section 776, testified that as defendant's present president he is responsible for administrative activities meeting with department heads, determining company policy and making financial decisions. Although he denied any familiarity with automobile mechanics or repair orders, he said he instructed his employees to comply with consumer protection laws. He said it was the usual practice for the service writer when a customer telephoned a verbal authorization to record the customer's name and phone number, the date and time of the conversation and to provide an initial estimate. If it later is determined that the cost of re-

pairs will exceed that estimate, work is terminated pending customer authorization. In 1973 defendant's service writers were instructed to give each customer a written estimated price for parts and labor. No guarantee other than the manufacturer's guarantee on parts was extended to the customer.

Defendant introduced testimony of its former service manager, Jim Bodhaine, who was self-employed at the time of the second trial, to contravert plaintiff's claim that the work was unauthorized or improperly done. "Defendant's service manager, Mr. Bodhaine, was a witness in behalf of defendant. He testified that during the conversations with plaintiff on May 14, 1973, he advised her that a compression check had been made upon the engine of her car which revealed that it had blown a head gasket and most likely had burned valves. The estimated cost of replacing the head gasket and replacing the valves was $300 to $500. Plaintiff orally approved this estimate. It was based on the assumption that there was no further damage such as cylinder wall damage. According to Bodhaine, when the engine was disassembled, it was found that in addition to a blown head gasket and burned valves, there was severe cylinder wall damage. Plaintiff had stated that she would call again on Tuesday, May 15, so the work was stopped, awaiting her call. Plaintiff called on the 15th and was given the bad news. Bodhaine recommended a new short block at an estimated total cost of about $2,000. According to Bodhaine, plaintiff approved this work and Bodhaine made a notation on the work sheet copy of the invoice. In the space headed 'Authorized Addition,' he made the entry '$1500.00,' and in the space marked 'Authorized By,' he entered 'Phone Owner 10:10 5/15/73.' This correlated with another shop copy showing an original estimate of $300 to $500." (*Id.*, at p. 491.)

In response to questions relative to the defects in repair specified by Anthony Adams, Bodhaine conceded that the air filter should have been replaced if dirty, that the distributor should have been tightened if loose, and that the cylinders should exhibit a variance in compression not to exceed 5 percent in a car with valves recently ground. His opinion that neither the difference in spark plugs nor the absence of a thermostat would cause the engine to overheat was corroborated by an engineer from Champion Spark Plug. An engineer from an independent testing lab, who disassembled the Mercedes at defendant's request about a month prior to the second trial, testified that the valves had been ground. Bodhaine was, however, unable to explain the welded shut

water reserve return line which he acknowledged would cause the engine to overheat.

In addition to the testimony of its service writer, Jim Bodhaine, defendant Motors introduced testimony seeking to contravert plaintiff's claim that she did not authorize or know about the expensive repairs to the Mercedes before she came to pick it up in June 1973. Darris Sloan, who was defendant's service manager during May and June 1973, testified that when Ms. Zhadan came to his office after she was presented with the bill she was not crying, did not appear to be in shock, and did not complain either that the bill was too high or that the work was unauthorized. She told him that she needed financing because her boss would not help her take care of it, and Sloan got her in touch with Dial Finance. She later left Sloan's office telling him that Dial would have to check her credit, and he did not see her again. About a week later he discovered that the Mercedes was missing from the lot. Sloan further testified that telephone authorizations for service may be accepted where a car is brought in by a third party while the customer is out of town; that an estimate is written on the service order; that the parts taken from the Mercedes were not held because Ms. Zhadan made no request; and that the car was road-tested by both the quality control man and the service writer after completion of repairs.

Jerry Buchanan, district manager for Dial Finance Corporation, recalled that he was contacted by Ms. Zhadan during June 1973 because her name was unusual and the amount of the bill was so high. She was unable to qualify for credit or to obtain an acceptable cosigner and the loan application was rejected. One morning a little later he received a phone call from defendant advising him that the car had been removed from their lot and they wanted information from Ms. Zhadan's credit application. Terry Warren, defendant's credit manager, made out the police report for repossession dated June 19, 1973, using information thus obtained.

With respect to damages, there was testimony that the Mercedes in need of a short block would at the time of these events have had a value of $1,200 to $1,700 while the car in good condition would have been worth approximately $4,500. Ms. Zhadan elected during trial to claim the value of the converted automobile rather than loss of use damages. The defendant retained the Mercedes in its possession from the time of its repossession until the second trial while Ms. Zhadan in the interim

used rental cars and continued to discharge her legal obligation to pay $164.79 per month finance charges on the car defendant withheld.

Lee Whitehurst, defendant's business manager, testified that the net worth of Motors as disclosed by its financial statement was $438,588.85 on December 31, 1973. He was permitted to testify, over objection, that defendant's net worth was $890,847 at the end of 1976 and in October of 1977 it was $1,314,387.

At the conclusion of the trial the jury returned a unanimous verdict in favor of plaintiff assessing general damages of $5,260 and punitive damages in the sum of $90,000. Defendant's motion for a judgment notwithstanding the verdict or a new trial was denied and defendant appealed.

## ISSUES

Defendant contends on appeal: (1) That the evidence was insufficient to support the judgment; (2) that the trial court erred in refusing to declare a mistrial because plaintiff was coaching a witness; (3) that the award of exemplary damages was excessive and that the trial court erred in refusing defendant's requested instruction regarding exemplary damages; and (4) that the trial court erred in admitting into evidence the net worth of defendant Motors as of December 31, 1976, and October 1977.

## DISCUSSION

### I

Defendant Motors contends that the evidence is insufficient to support the verdict of the jury which impliedly found defendant guilty of consumer fraud and malicious and oppressive conduct in conversion of an automobile.

Since the evidence presented by plaintiff in this trial was substantially the same as that introduced at her earlier trial, the following observations of the appellate court with respect to the case established by plaintiff are significant. "The evidence in this case supported plaintiff's charge of a serious violation of the policy of the Business and Professions Code provisions designed to protect consumers against unscrupulous automotive repair dealers. The jury was entitled to believe

plaintiff's testimony which was to the effect that unauthorized repairs were performed on her vehicle for which defendant sought to charge over $1,950 upon a vehicle which, according to defendant's expert, had a value not to exceed $1,700. Further the jury was entitled to believe plaintiff's evidence that a substantial portion of the work was never performed. The jury was, therefore, entitled to consider defendant's conduct a flagrant violation of the provisions of Business and Professions Code section 9884.9, which provides in pertinent part: 'No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer.'" (*Zhadan v. Downtown L. A. Motors, supra,* 66 Cal.App.3d 481, 497.)

Defendant Motors, however, argues that the weight of the opposing evidence it presented at the second trial establishes facts which militate against plaintiff's recovery. Defendant claims, for instance, that Ms. Zhadan's telephone authorization of the work on May 15 is established by Jim Bodhaine's notes on the dispatcher's copy of the service order, by records which show that the short block was picked up on May 16, and by the fact that the telephone records of the company by which Ms. Zhadan was then employed do not include May and June 1973. The jury, however, was entitled to resolve conflicts in the evidence and it does not necessarily follow from this evidence that plaintiff testified untruthfully when she denied that she authorized the work and said she did not talk to Bodhaine after May 14. Defendant also points out that plaintiff on returning from New York took a Hertz rental car from Los Angeles airport on June 2, drove to Oregon where her parents resided, and returned on June 5.

In addition Terry Warren, defendant's credit manager, testified that Walter Hoffman, a sales representative for Carpet Bags of America, called him from New York between June 1 and June 10 to inquire the amount of the bill and possible payment arrangements. Defendant argues that this evidence, together with Bodhaine's testimony, establishes plaintiff's knowledge that she had authorized expensive repairs because she engaged in a search for funds to satisfy the anticipated claim before going to Motors to claim her car.

The exact date plaintiff appeared at Motors to pick up her car was not established. She testified that she drove it to the Bon Voyage Garage the next day and the receipts are dated June 15 and 16. However, Ms. Zhadan also said the Bon Voyage Garage had the car for several

days because, among other things, the radiator was sent out for repair. Both plaintiff and Walter Hoffman testified that when she told him about the car repair, he referred her to his lawyer; he suffered a heart attack June 13, 1973, and said he did not recall calling defendant about the problem. Although the trip to Oregon is not disputed, plaintiff explained that she customarily visited her parents on returning from New York and it cannot be inferred that the purpose was to seek financial aid.

The jury was entitled to believe plaintiff's testimony that she did not authorize the repairs made by defendant Motors to her car; she was not given a written estimate or told all of the information which the written estimate should include, and never approved either orally or in writing any written estimate of specific repairs to her car. This conduct was a violation of Business and Professions Code sections 9884.8 and 9884.9. (See, e.g., *Bennett* v. *Hayes* (1975) 53 Cal.App.3d 700 [125 Cal.Rptr. 825]; see also Cal. Admin. Code, tit. 16, §§ 3353, 3354.) Plaintiff's testimony that she was given no written guarantee was admitted by both Shammas and Sloan; in addition the invoice did not specify whether the parts were new, rebuilt, reconditioned or used; and arguably the descriptive term "engine job" was ambiguous; these substantiate violations of title 16, California Administrative Code sections 3370-3374. She said she did not know before this case arose that there was a mechanic's lien law and she removed her car because she believed she was being cheated by defendant which tried to charge her for work she did not authorize.

■ The function of the appellate court is not to reweigh the evidence but merely to determine whether the verdict reached by the jury is supported by substantial evidence in the record. It is well established that with respect to the sufficiency of the evidence the power of the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, that will support the verdict. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) The appellate court may reverse the decision only if there is no evidence to support the verdict. (*Pacific Palisades Assn.* v. *Menninger* (1933) 219 Cal. 257 [26 P.2d 303].)

## II

■ Defendant further argues that the trial court erred in refusing to declare a mistrial on grounds that plaintiff was coaching a witness.

During examination of witness Nora Watson a juror reported that plaintiff was nodding or shaking her head which appeared to be an attempt to surreptitiously coach the witness and on defendant's motion for mistrial the court conducted a hearing. Neither the court nor the bailiff had observed any motions of plaintiff's head and plaintiff denied nodding or coaching the witness. The court denied the motion observing that in any event Nora Watson's testimony contained merely corroboration of events to which plaintiff had previously testified. Under the circumstances no abuse of the trial court's discretion appears. (*Walling v. Kimball* (1941) 17 Cal.2d 364, 370 [110 P.2d 58]; see also *Gray* v. *Robinson* (1939) 33 Cal.App.2d 177, 182 [91 P.2d 194].)

## III

■ The defendant contends that the award of $90,000 exemplary damages to Ms. Zhadan is excessive since it does not bear a reasonable relation either to actual damage or to the defendant's wealth and therefore must have resulted solely from the passion or prejudice of the jury. Defendant argues that an exemplary damage award must bear a reasonable relationship to the actual damage taking into account the defendant's wealth and the type and magnitude of the wrongdoing. (*Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481, 496.) It is defendant's position that the amount of the exemplary damage in the case at bench is excessive as a matter of law and raises the presumption that it resulted from passion or prejudice on the part of the jury. (*Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266 [95 Cal.Rptr. 678].)

This action was tried twice and the evidence of defendant's malice, fraud and oppression introduced at each trial was essentially the same. In each case the jury awarded substantial punitive damages. The punitive damages in the amount of $175,000 awarded at the first trial constituted approximately 33 percent of defendant's then net worth of $532,000. (*Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481, 499.) Defendant's motion for new trial was granted conditioned upon a reduction in the amount of punitive damages. When plaintiff refused and the appeal was heard, the appellate court observed that although punitive damages were supported by the evidence, the actual award could be justified only on the assumption that it was necessary to put defendant out of business to deter future conduct of a similar kind. Since this was deemed inappropriate, the court concluded the excessive

award was based upon passion or prejudice of the jury and granted a new trial.

The jury at the second trial found the evidence to support a punitive damage verdict of $90,000 at a time (1977) when defendant's net worth was $1,314,000. At the close of the second trial the court denied defendant's motion for new trial and/or judgment notwithstanding the verdict pointing to the unanimous jury verdict. ■ This award must be viewed in light of the applicable principles of law, which were summarized by the appellate court in its earlier decision as follows: "'[I]t is the province of the jury, and the trial court on the motion for a new trial, to say whether punitive damages should be awarded. The presumptions are in favor of the correctness of the verdict and judgment. After an award has been approved by the trial court the reviewing court will hesitate to declare the amount excessive unless upon consideration of the entire record including the evidence it must be said that the award was the result of passion or prejudice. (See *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 801 [ . . . ]; *Pickwick Stages* v. *Board of Trustees,* 54 Cal.App. 730 [ . . . ]; *Singleton* v. *Singleton,* 68 Cal.App.2d 681, 704 [ . . . ].)'

"·     ·     ·     ·     ·     ·     ·     ·     ·     ·     ·     ·     ·

■ "Also pertinent to our consideration is the rule that 'an award of punitive damages must bear a reasonable relationship to actual damage . . .' (*Schroeder* v. *Auto Driveaway Co.,* 11 Cal.3d 908, 922 [ . . . ]; see also *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 802 [ . . . ].) Likewise applicable is the principle that, the purpose of punitive damages being to punish the defendant and make an example of him, 'the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective' (*Bertero* v. *National General Corp.,* 13 Cal.3d 43, 65 [ . . . ]), from which it 'also follows that the poorer the wrongdoing defendant the smaller the award of punitive damages need be in order to accomplish the statutory objective' (*Merlo* v. *Standard Life & Acc. Ins. Co.,* 59 Cal.App.3d 5, 18 [ . . . ]). Finally, due consideration must be given to the importance of the public policy embodied in the statutory provisions the violation of which was the basis of plaintiff's claim, and the magnitude of defendant's violation of such policy. (*Wetherbee* v. *United Ins. Co. of America,* 18 Cal.App.3d 266, 270-271 [ . . . ]; *Weisenburg* v. *Molina,* 58 Cal.App.3d 478, 490 [ . . . ].)

"The evidence in this case supported plaintiff's charge of a serious violation of the policy of the Business and Professions Code provisions designed to protect consumers against unscrupulous automotive repair dealers. The jury was entitled to believe plaintiff's testimony which was to the effect that unauthorized repairs were performed on her vehicle for which defendant sought to charge over $1,950 upon a vehicle which, according to defendant's expert, had a value not to exceed $1,700. Further the jury was entitled to believe plaintiff's evidence that a substantial portion of the work was never performed. The jury was, therefore, entitled to consider defendant's conduct a flagrant violation of the provisions of Business and Professions Code section 9884.9, which provides in pertinent part: 'No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer.'

". . . . . . . . . . . . . . .

"The evidence thus fully supported the imposition of punitive damages in a very substantial amount. . . ." (*Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481, 496-497.)

The Legislature has established consumer protection policies to safeguard the public from being duped by unscrupulous sellers and the jury apparently reached a verdict that would serve as an example to others not to engage in similarly reprehensible conduct. Once again, the evidence fully supports a substantial award of punitive damages.

The punitive damages awarded in the present case are over 17 times the actual damages and constitute less than 7 percent of defendant's net worth. Once more we are guided by the principles previously set forth by this appellate court in *Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481. "[A]s our Supreme Court stated in *Finney* v. *Lockhart, supra,* 35 Cal.2d 161, 164 [ . . . ]: '[T]here is no fixed ratio by which to determine the proper proportion between the two classes of damages.' In *Finney,* an award of $2,000 exemplary damages in a case in which nominal damages of $1 were awarded was affirmed.

"More apposite, perhaps, is the decision of this statewide court in *Wetherbee* v. *United Ins. Co. of America, supra,* 18 Cal.App.3d 266. In that case, an award of punitive damages in the sum of $200,000 was affirmed where the compensatory damages amounted only to $1,050. In answer to defendant's contention that this was an excessive ratio, the

court in *Wetherbee* said (18 Cal.App.3d at p. 271): 'Defendant particularly points to the disparate ratio of the $1,050 actual damages to the $200,000 of exemplary damages in the jury award. There is no fixed ratio by which to determine a proper proportion between the two classes of damages; the factors influencing the amount of the exemplary award can only be disclosed by the trial record (*Finney* v. *Lockhart,* 35 Cal.2d 161, 164 [ . . . ]). Although superficial comparisons are of little value, we note that in *Finney* v. *Lockhart, supra,* the actual damages awarded were $1, the exemplary damages, $2,000, the identical ration here present.'

"What the court made clear in *Wetherbee* is that the excessiveness of a punitive damage award cannot be established by reference alone to the disparate ratio between it and the compensatory damage award. In that case of an aggravated consumer fraud committed by an insurance company, the court noted the necessity for a large punitive award in order to adequately 'serve as an example or warning to others not to engage in such conduct' (18 Cal.App.3d at p. 270), and to make 'the punishment fit the offense' (*id.*), in light of the great net worth and high profits of the defendant. The court pointed out in this respect (18 Cal.App.3d at p. 271): 'The record indicates that according to defendant's 47th report to its stockholders, it had $300,000,000 in gross assets, $60,000,000 in net assets, and a monthly net income after taxes of $1,000,000. The $200,000 amount awarded by the jury represents less than a week's after-tax income of the defendant. The jury measured the punishment in the light of the evidence, indicating defendant's ability to respond to the award (*Coy* v. *Superior Court,* 58 Cal.2d 210 [ . . . ]) and in doing so made the example as well as the punishment fit the offense.'

"It is apparent, therefore, that a 'reasonable relationship' between the compensatory and the punitive damages involves much more than a simple mathematical comparison between the two amounts awarded. Given a fixed amount of compensatory damages, the amount of punitive damages which will serve the purpose to punish the offense and to serve as an example to others will necessarily vary widely, the factors involved being the importance of the policy violated by defendant's conduct, the degree and extent, both qualitatively and quantitatively, of the violation, and the financial circumstances of the defendant. . . ." (66 Cal.App.3d at pp. 498-499.)

Clearly the wealth of the defendant is of primary importance in this regard. "[T]he primary purpose of punitive damages is to punish the defendant and make an example of him. (Civ. Code, § 3294; see *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 65. [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R. 3d 878].) 'It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective.' (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 65 and cases there cited.)..." (*Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal. App.3d 5, 18 [130 Cal.Rptr. 416].)

■ Defendant was not prejudiced by the trial court's refusal of the requested instructions on the necessity for a reasonable relationship of punitive damages to the award of actual damages and defendant's net worth which was allegedly taken from the earlier *Zhadan* decision.[2] The trial court requested counsel to prepare and confer together regarding proposed instructions. Thereafter the instructions were reviewed by the trial court and discussed with both counsel. Defense counsel specifically objected to plaintiff's special request for a different instruction on the subject,[3] also purportedly derived from the earlier *Zhadan* case decision, on the ground that the matter was covered by the BAJI instruction on punitive damages (BAJI No. 14.71).[4] Based on that objection, the court refused plaintiff's special instruction No. 28.

---

[2]The instruction requested by defendant reads as follows: "If any punitive or exemplary damages are awarded by you, the amount of punitive and exemplary damages must bear a rational or reasonable relation to the actual damage suffered by plaintiff and not be disproportionate in relation to the net worth of the defendant."

[3]Following is plaintiff's requested special instruction No. 28: "Punitive damages must bear a *reasonable relationship* to actual damages. However, this involves more than a simple mathematical comparison between the two amounts. Given a fixed amount of compensatory damages, the amount of punitive damages which will serve the purpose to punish the offense and to serve as an example to others will necessarily very [*sic*] widely, the factors involved being the importance of the policy violated by defendant's conduct, the degree and extent, both qualitatively and quantitively of the violation, and the financial circumstances of the defendant. Where the objective of deterrence would not otherwise be served, the wealthy defendant cannot legitimately object to a ratio between punitive and compensatory damages that is high in degree.

"You are to consider all of the facts in evidence presented in this case, the purpose of the Business and Professional Code and the California Administrative Code Sections previously read to you; the magnitude and flagrancy of the offense, the importance of the policy you find to be violated and upon all of the circumstances and facts surrounding this case and upon all the instructions of law I will give to you."

[4]BAJI No. 14.71 (1977 revision) as modified for this case was given as follows: "If you find that plaintiff or defendant suffered actual damage as a proximate result of the conduct of the party on which you base a finding of liability, you may then consider whether you should award additional damages against the other party, for the sake of

It is well established that it is the responsibility of counsel to propose correct instructions and the court has no duty to modify erroneous instructions submitted to it. Furthermore, a party is not entitled to have the jury instructed in any particular phraseology and may not complain on the ground that his requested instructions are refused if the court correctly gives the substance of the law applicable to the case. (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 336 [145 Cal.Rptr. 47].) Defendant, having conceded that the substance of plaintiff's special instruction No. 28 taken from the appellate opinion in the first appeal in this case was covered by BAJI No. 14.71, cannot be heard to complain because its own abbreviated version of the principle was rejected by the trial court. (See, e.g., *Miner* v. *Dabney-Johnson Oil Corp.* (1933) 219 Cal. 580, 583 [28 P.2d 23]; *Tuttle* v. *Crawford* (1936) 8 Cal.2d 126, 133 [63 P.2d 1128].)

### IV

■ Defendant finally contends that the trial court improperly admitted evidence of defendant's net worth at time of trial which was substantially greater than at the time of the first trial. Defendant argues, without referring this court to any legal authority, that its net worth at the time of the event or injury to the plaintiff is the proper figure to submit to the jury. It has been determined that the jury should make its determination of the punitive damages based on defendant's net worth at the time of trial. (*Marriott* v. *Williams* (1908) 152 Cal. 705, 710 [93 P. 875].) The trial court correctly ruled this evidence admissible.

---

example and by way of punishment. You may in your discretion award such additional damages, known as punitive or exemplary damages, if, but only if, you find by a preponderance of the evidence that said party was guilty of [oppression] [fraud] [or] [actual malice] in the conduct on which you base your finding of liability.'

"['Malice' means a motive and willingness to vex, harass, annoy, or injure another person. Malice may be shown by direct evidence of declarations of hatred or ill-will or it may be inferred from acts and conduct, such as by showing that the conduct was wilful, intentional, and done in reckless disregard of its possible results.]

"['Oppression' means subjecting a person to cruel and unjust hardship in conscious disregard of his rights.]

"['Fraud' as used in this instruction means an act of trickery or deceit, intentional misrepresentation, concealment or nondisclosure committed for the purpose of causing injury or depriving a person of his property or his legal rights.]

"The law provides no fixed standard as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice."

## DISPOSITION

The judgment is affirmed.

Lillie, Acting P. J., and Kaufmann, J.,* concurred.

A petition for a rehearing was denied January 23, 1980, and appellant's petition for a hearing by the Supreme Court was denied February 27, 1980.

---

*Assigned by the Chairperson of the Judicial Council.